# UNITED DISTRICT COURT
## FOR THE UNITED STATES DISTRICT OF FLORIDA
## MIAMI DIVISION

CASE NO.: 00-2927 CIV-MORENO
MAGISTRATE DUBE

LORNA BEACH-ALLEN,                    )
                                      )
   Plaintiff,                         )
                                      )
     v.                              )
                                      )
ECONOMIC OPPORTUNITY FAMILY           )
HEALTH CENTER, INC. a Florida         )
Corporation,                          )
                                      )
   Defendants.                        )
_____     )

## PLAINTIFF'S WITNESS AND EXHIBIT LISTS

Plaintiff, LORNA BEACH-ALLEN, through her undersigned counsels, file

this Witness and Exhibit Lists pursuant to this Court's Order dated January 25, 2002.

**1.**   **PLAINTIFF'S WITNESS LIST**

   **A.**   **EXPERT WITNESSES:**

   1.       Dr. Evan A. Rosen, D.C., P.A.
          7195 W. Oakland Park Blvd.
          Ft. Lauderdale, FL 33021
          Tel: 954-742-5265

**Testimony:**  Dr. Rosen will testify about Ms. Lorna Beach-Allen's permanent disability.

   2.       Dr. Michael H. Wilensky, M.D., P.A.  -
          2540 N. State Rd. 7
          Hollywood, FL 33021
          Tel: 954-963-1899

**Testimony:**  Dr. Wilensky will testify about Ms. Beach-Allen's permanent disability.

3.          Mr. Rick Ross  -
            113 Pavonia #323,
            Jersey City, NJ 07310-1756
            Tel: 201-222-3531

**Testimony:**   Mr. Ross will testify about religious cults and their practices.

**B.**     <u>**NON-EXPERT WITNESSES:**</u>

1.          Mr. Marvin  Daniels  -
            Rainbow Village,
            2140 N.W. 3rd Ave.
            Miami, FL
            Tel:  305-576-9699

**Testimony:**   Mr. Daniels will testify about  M.A.P.I. Program office space
                 and the mandatory cleaning requirement.

2.      Dr. Willie L. Brown, Ph.D.  -   Information is unavailable at this time.

**Testimony:**   Dr. Brown will testify about Plaintiff's professionalism and program
                 management skills; also, Ms. Hafke's hiring practices at EOFHC..

3.          Ms. Lorna Beach-Allen  -
            251 NW 177th Street, #A-207
            Miami, FL 33169
            Tel:  305-623-8997

**Testimony:**   Ms. Beach-Allen will testify about discrimination, retaliation,
                 harassment, hostile work environment and adverse practices.

4.          Ms. Wylene Simmons  -
            2331 N. State Road 7,
            Lauderhill, FL 33313
            Tel:  954-689-7132

**Testimony:**  Ms. Simmons will testify about the hostile working environment,
                 Joyce Green's anger and resentment and open positions.

5.          Ms. Kalenthia Nunnally
            2135 N.W. 52nd Street,
            Miami, FL 33142
            Tel: 305-634-4990

**Testimony:**   Ms. Nunnally will testify about Ms. Frankie Swain and  M.A.P.I.

6.              Ms. Pat Allen
                2135 N.W. 52nd Street,
                Miami, FL 33142
                Tel: 305-634-4990

**Testimony:**     Ms. Allen will testify about maintenance of M.A.P.I offices.

7.              Ms. Hygeita Hyatt -    Information is unavailable at this time

**Testimony:**     Ms. Hyatt will testify about personnel policies and procedures and her
                communication with Canada Life Insurance.

8.              Mrs. Billy Gean Andrews -
                1737 N.W. 3rd Ave., Apt. C
                Miami, FL 33136
                Tel: 305-576-9889

**Testimony:**     Mrs. Andrews will testify about Plaintiff's humanitarian efforts, the hostile
                working environment, and Ms. Chantal Hafke.

9.              Ms. Rosa Martin -  Information is unavailable at this time.

**Testimony:**     Ms. Martin will testify about religious discrimination, hostile work
                environment and harassment.

10.             Mr. Mark R. Trimmings-
                610 NW 184th Terr.,
                Miami, FL 33169
                Tel: 305-343-2996

**Testimony:**     Mr. Trimmings will testify about Frankie Swain and Chantal Hafke.

11.             Mrs. Doreen McClendon - Tel: 305-756-5165

**Testimony:**     Mrs. McClendon will testify about fear and intimidation under Frankie
                Swain and Chantal Hafke and treatment of Plaintiff and volunteer
                employees.

12.             Ms. Rose Celestine - Information is unavailable at this time.

**Testimony:**     Ms. Celestine will testify about coordination and supervision of M.A.P.I.
                Program and Ms. Hafke's church recruitment efforts.

13.          Mr. Frank DeValdivielso, Sr.
             1350 N.W. 14th Street, Rm. #204,
             Miami, FL 33125
             Tel: 305- 278-0351

**Testimony:**   M.A.P.I. Program's contract  and relationship with Health Dept.

## 2.      EXHIBIT LISTS:

P. EXHIBIT 1          Dr. Rosen's Final Evaluation of Ms. Lorna Beach-Allen (4/4/1996).

P. EXHIBIT 2          Ms. Lorna Beach-Allen's Disability Certificate.

P. EXHIBIT 3          Memorandum to Ms. Carolyn Broughton from Dr. Willie Brown
                      Ref: Ms. Hafke's  promotion to Special Populations Director
                      and an increase in salary.

P. EXHIBIT 3b         Memorandum sent to Dr. Clarence Lawrence - Re: Appointment to
                      Discuss Written Warnings submitted by Frankie Swain.

P. EXHIBIT 4          Florida Death Record of Frankie Swain (www.Lexis.com).

P. EXHIBIT 5          Medical Leave of Absence.

P. EXHIBIT 6          Ms. Swain's Performance Review.

P. EXHIBIT 6b         Letter from Mr. Billy Gean Andrews.

P. EXHIBIT 7          Ms. Hygeita Hyatt's Letter to EEOC stating that she spoke to Peggy Giggs
                      at Canada Life.

P. EXHIBIT 8          Ms. Carolyn Broughton's Letter to Florida Department of Labor &
                      Employment Security- requested hearing of redetermination letter.

P. EXHIBIT 9          Determination Letter from Florida Department of Labor & Employment
                      Security. (Date mailed:05-19-99)

P. EXHIBIT 10         Management Performance Evaluation of Ms. Beach-Allen, evaluation
                      period: 12-30-96 to 6-30-97.

P. EXHIBIT 11         Management Performance Evaluation response to Dr. Clarence
                      Lawrence from Ms. Beach-Allen.

P. EXHIBIT 12         Letter to Ms. Broughton from Dr. Brown granting Ms. Beach-Allen
                      permanent full-time status & 5% raise in pay.

| | |
|---|---|
| P. EXHIBIT 13 | Economic Opportunity Family Health Center, Inc.(EOFHC) Manual in ref. to mission, goals and treatment programs. |
| P. EXHIBIT 14 | EOFHC  Organizational Chart. |
| P. EXHIBIT 15 | Department of Special Populations Organizational Chart. |
| P. EXHIBIT 16 | Organizational Chart for M.A.P.I. -"The L.O.V.E. Project." |
| P. EXHIBIT 17 | Dr. Michael H. Wilensky Report- MRI Results of Lorna Beach-Allen. |
| P. EXHIBIT 18 | Beach-Allen's Leave Request Form for 1 days sick leave approved by SPEC Populations. (Approval Date for 04-28-97 - 04-28-97) |
| P. EXHIBIT 19 | Beach-Allen's Leave Request Form for 2 days sick leave approved by SPEC Populations. (Approval Date for 06-16-97 - 06-17-97) |
| P. EXHIBIT 20 | Beach-Allen's Leave Request Form for 4 days sick leave approved by M.A.P.I. Program. (Approval Date for 09-09-97 - 09-12-97) |
| P. EXHIBIT 21 | Beach-Allen's Leave Request Form for 2 days sick leave approved by SPEC Populations. (Approval Date for 01-26-98 - 01-27-98) |
| P. EXHIBIT 22 | Joyce Green's Leave Request Form for 3 days funeral leave approved by Ms. Beach-Allen. (Approval Date for 03-12-98 - 03-17-98) |
| P. EXHIBIT 23 | Picture of Ms. Lorna Beach-Allen picking up trash on the job. |
| P. EXHIBIT 24 | Letter from Ms. Shannon McCain a short term disability examiner at Canada Life. |
| P. EXHIBIT 25 | Continuance of Short Term Disability attending Physician's Statement. (05-15-98) |
| P. EXHIBIT 26 | Continuance of Short Term Disability attending Physician's Statement. (12-28-98) |
| P. EXHIBIT 27 | Canada's Life Letter in ref. to Ms. Beach-Allen's Short Term Disability 2nd Appeal. |
| P. EXHIBIT 28 | Ms. Joyce Green's Earnings Statement. |
| P. EXHIBIT 29 | M.A.P.I. Program Narrative, monthly report from Beach-Allen (06-30-97) |

P. EXHIBIT 30       Ms. Carolyn Broughton's Letter to Florida Department of Labor & Employment Security- requested hearing of redetermination letter.

P. EXHIBIT 31       Leave of Absence Approval Form.

P. EXHIBIT 32       Letter to Ms. Broughton to Ms. Hafke in reference to Ms. Beach-Allen's Transfer from Program Coordinator to Case Manager.

P. EXHIBIT 33       Letter to Ms. Joyce Green from Ms. Carolyn Broughton terminating Ms. Green's employment.

P. EXHIBIT 34       Letter to Ms. Beach-Allen from Ms. Broughton confirming receipt of Dr. Rosen's written statement.

P. EXHIBIT 35       Lock Towns Community Mental Health Center Reference Request Form.

P. EXHIBIT 36       Dismissal and Notice of Rights Form.

P. EXHIBIT 37       Determination Letter from Florida Department of Labor & Employment Security. (Date mailed:02-04-99)

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was mailed on this

day _31_ of _July_ ,2001 to Reginald J. Clyne, Esquire, CLYNE & SELF, P.A.

Douglas Center, 2600 Douglas Road, C Suite 1100, Coral Gables, FL 33134.

Mair, Jean-Francois & Associates, P.A.
3500 N. State Road 7, Suite 479
Ft. Lauderdale, Florida 33319
Tel: (954) 730-0082
Fax: (954) 777-0290

By:_____
James Jean-Francois, Esquire
Attorney for Plaintiff
Fla. Bar. No. 0495115

# DR. EVAN A. ROSEN, P.A.
## CHIROPRACTIC PHYSICIAN

REPLY TO:

NORTH DADE

RE: Lorna Beach-Allen
D/A: 4/4/96

## FINAL EVALUATION

Ms. Lorna Beach-Allen entered my office on September 24, 1996 for
a final evaluation.  Following are the results of my findings and
conclusions in this case.

## FINAL COMPLAINTS

At the time of my examination on September 24, 1996, Ms. Beach-
Allen continued to have complaint of neck, mid back, and lower
back pain which varies in degree of severity.  She stated that
the pain is aggravated by prolonged sitting or standing.

## FINAL EXAMINATION

Ms. Beach-Allen's blood pressure was 112/80.  Her pulse rate was
78 beats per minute.

Ms. Beach-Allen is right handed.  Dynamometer grip strength test-
ing revealed the following:  right hand 40 and left hand 40.

Examination of the patient's cervical spine revealed spasm and
tenderness along the cervical paraspinal musculature bilaterally.
The range of motion of the cervical spine was painful in all
directions.  The Soto-Hall test localized pain at the level of
C3-C7.  The foramina compression and shoulder depression tests
were both positive bilaterally for complaint of cervical pain.
The cervical distraction test was negative.  Pinwheel testing
revealed sensation to be intact along the upper extremities.  The
biceps and triceps reflexes were active and symmetrical.

Examination of the patient's thoracic spine revealed mild spasm
and tenderness along the thoracic paraspinal musculature, more so
on the left side.  The range of motion of the thoracic spine was
full in all directions.  The Soto-Hall test was productive of
thoracic pain at the level of T1-T7.

Examination of the patient's lumbosacral spine revealed complaint
of pain upon flexion and extension.  Tenderness was elicited upon
palpation of the lumbosacral spine, with associated spasm of the
corresponding paravertebral musculature.

CONTINUED

# P. EXHIBIT 1

PAGE 2

RE: Lorna Beach-Allen
D/A: 4/4/96


FINAL EXAMINATION (CONTINUED)

The Lasegue test was productive of lumbosacral pain at 80 degrees
on the right and 80 degrees on the left.  The Kemp, Ely, and
Patrick tests were all positive bilaterally for complaint of
lower back pain.  The sitting straight leg raise test was nega-
tive.  Pinwheel testing revealed a hypoesthesia along the right
S1 dermatome.  The achilles and patellar reflexes were equal,
active, and without incident.

An MRI scan of the cervical and lumbar spines was performed on
September 12, 1996.  The lumbar scan revealed a herniation of the
L4-L5 intervertebral disc.

FINAL ASSESSMENT

It is my opinion that Ms. Beach-Allen has attained a point of
maximum medical improvement.  There is no reason to expect any
major change in her clinical picture in the foreseeable future.
Her continued subjective complaints and positive objective exami-
nation findings are consistent with the dynamics of the injuries
sustained in the motor vehicle accident which occurred on April
4, 1996.  Further conservative chiropractic management will be
required in the future on an as-needed basis in direct proportion
to her activities.

Based upon the AMA's Guides to the Evaluation of Permanent Im-
pairment, copyright 1993, it is my opinion that Ms. Beach-Allen
has sustained a residual, 13% permanent partial impairment of the
whole person as a direct result of the injuries incurred in the
motor vehicle accident which occurred on April 4, 1996.


Respectfully submitted,

DR. EVAN A. ROSEN, P.A.

EAR/kz

**DISABILITY CERTIFICATE**

Date _9/9/97_

This is to certify that _LORNA BEACH ALLON_

has been under my professional care

from _9/15/96_ to _Present_

and was unable to work

from _9/9/97_ to _9/15/97_

Dr. _____ Authorizing Doctor

# EXHIBIT 2

## DISABILITY CERTIFICATE

Date _4/9/98_

This is to certify that _CORINA BRACH ALLON_

has been under my professional care

from _____ to _____

and was unable to work

from _4/7/98_ to _UNDETERMINED AT PROSENT TIME_

Dr. _____
Authorizing Doctor

## CHIROPRACTIC CARE CERTIFICATE

Date _4.7.98_

To whom it may concern:

This is to certify that: _Corina Brach-Allen_

received chiropractic care at this office on

_Tuesday, April 7, 1998_

Thank you

Dr. _____
Attending Doctor



**FAMILY HEALTH CENTER, INC.**

ECONOMIC OPPORTUNITY
FAMILY HEALTH CENTER, INC.
5361 N.W. 22nd Avenue
Miami, FL 33142
Tel: (305) 637-6400

## M E M O R A N D U M

**TO:**      Ms. Carolyn Broughton, Director, Human Resources

**THRU:**     Mr. Anthony E. Munroe, President & CEO

**FROM:**     Willie Brown, Ph.D., COO

**SUBJECT:**  Increase in Pay – Ms. Chantal Hafke, Director, Special Populations

**DATE:**     February 23, 1999

---

Ms. Hafke was promoted to Director, Special Populations in February 1998 with an increase in salary to $40,000. This salary was incompatible with those of the other Directors in the Center. However, due to budget constraints the Agency was not in a position to bring her salary on par with those of other Directors. It was agreed with Ms. Hafke that her salary would be adjusted at an appropriate time to be consistent with other Directors.

This memorandum authorizes a 5% increase retroactive to October 31, 1998.

Approved/Disapproved

_Anthony E. Munroe_  3/5/99
Anthony E. Munroe, President & CEO

Cc:    Mr. Robert Aguero, Director, Finance

# P.EXHIBIT 3

001029

ECONOMIC OPPORTUNITY
# *FAMILY HEALTH CENTER, INC.*
5361 N.W. 22nd Avenue * Miami, FL 33042 * Phone:(305)637-6400

MEMORANDUM

To:     Dr. Clarence Lawrence, Chief Operating Officer

From:  Ms. Loma Beach-Allen, Program Coordinator, M.A.P.I. Program

Date:  July 2, 1997

RE:    APPOINTMENT TO DISCUSS WRITTEN WARNINGS
_____

I am hereby requesting an appointment to meet with you regarding the attached Written Warnings , submitted to me by Ms. Frankie Swain, V.P., Special Populations, and my responses to them.

These pieces of correspondence, (copies attached) are all trivial in nature, and I consider them to be a form of harrassment.  They are designed to distract me from my duties as Program Coordinator, and to build a case for her to be able to terminate me.

I regret that you have to be involved in this action, but I was informed by Ms. Broughton that it is the next step to take in order to have these warnings removed from my personnel file.

Please inform me of the date and time in which you can see me, at your earliest convenience.  Thank you very much for your anticipated cooperation in this matter.

cc: Ms. Broughton, Personnel Dept.

# P.EXHIBIT 3b

Source: My Sources > People, Business & Asset Locators > Person Locator > FL Death Records ⓘ
Terms: swain (Edit Search)

↳ Select for FOCUS™ or Delivery
⌐

*SWAIN, FRANKIE MAE*

**\*\*\* THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY \*\*\***

FLORIDA DEATH RECORDS

**Name:** **SWAIN**, FRANKIE MAE

**Age:** 55 YEARS OLD

**Date of Death:** 4/10/1999

**County of Residence:** MIAMI-DADE

**County of Death:** MIAMI-DADE

**State Certificate Number:** 047129

**\* \* \* \* \* \* PERSONAL INFORMATION \* \* \* \* \* \* \***

**Gender:** FEMALE

**Race:** BLACK/NON-HISPANIC

**Social Security Number:** 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

**Date of Birth:** 3/31/1944

**Birthplace:** FLORIDA

**Father's Name:** **SWAIN**, JOSEPH F

**Mother's Name:** CARR, LEILA M

**Address:** BALANCE OF COUNTY, FL 33147

**Marital Status:** DIVORCED

**Education:** 5 OR MORE YEARS OF COLLEGE

**\* \* \* \* \* \* DEATH-RELATED INFORMATION \* \* \* \* \* \***

**Autopsy:** NO

**Referred to Medical Examiner:** NO

**Disposition:** BURIAL

**Injury Location:** FL, MIAMI-DADE COUNTY

**Hospital Status:** HOSPITAL-INPATIENT

P. EXHIBIT 4

**U.S. Armed Forces:** NO

**Place of Death:** BALANCE OF COUNTY

**Certifier:** M.D. OR OTHER SPECIFIED

**Local File Number:** 05701

Source: My Sources > People, Business & Asset Locators > Person Locator > FL Death Records ⓘ
Terms: **swain** (Edit Search)
View: Full
Date/Time: Wednesday, May 8, 2002 - 9:59 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

DETERMINATION NOTICE OF UNE___OYMENT COMPENSATION CLAIM FILI___

| | N C H | | U N D |
|---|---|---|---|
| 1335442241  0802980  9850820  1 275  06610    040197 033198    0000 | | | |

| EMPLOYER NUMBER       9850820 | LOC CODE | LORNA      M BEACH ALLEN |
|---|---|---|
| EFF. DATE OF CLAIM:    08/02/98 | | SOCIAL SECURITY #:      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 |
| AVAILABLE CREDITS:        $6610 | | LOCAL OFFICE:  N. MIAMI BCH JOBS &    3677-0 |
| % CHARGEABLE:       100.000% | | DATE MAILED TO EMPLOYER:  08/20/98 |

IF THE CLAIMANT WAS LAID OFF DUE TO LACK OF WORK, YOU DO NOT NEED TO RETURN THIS FORM UNLESS YOU COMPLETE ITEMS A, F, OR G BELOW.

PLEASE COMPLETE THE APPROPRIATE SECTIONS BELOW. MARK THE BOX(ES) FOR THE ANSWERS THAT ARE APPLICABLE TO THIS INDIVIDUAL.

☐ A. Upon separation, this worker was entitled to the following payments.

| TYPE OF PAY | AMOUNT | PERIOD | | TYPE OF PAY | AMOUNT | PERIOD | |
|---|---|---|---|---|---|---|---|
| | | FROM | TO | | | FROM | TO |
| SEVERANCE/ GOODWILL | | | | RETIREMENT/ DISABILITY | | | |
| WAGES IN LIEU OF NOTICE | | | | HOLIDAY/ VACATION* | | | |

*If vacation pay, enter recall date:_____

☐ B. The worker was discharged on (date)_____

   by (name)_____(title)_____for (use REMARKS area below to give details of the reason for discharge checked below):

   ☐ 1. Inability to perform work/unsatisfactory work performance (not willful misconduct).
   ☐ 2. Misconduct (In the remarks section, describe the specific event(s), incident(s), or rule infraction(s) that caused the discharge. If the worker received any warnings, give the date(s) and reason(s).
   ☐ 3. Unsatisfactory job performance during an established initial 90 day employment probationary period of which the worker was notified during the first seven work days.

☐ C. The worker voluntarily quit on (date)_____because_____.
   (Continue in REMARKS section if necessary.)

☐ D. The worker was suspended from_____to_____.

   1. Date worker is scheduled to return to work_____

☑ E. The worker is on a leave of absence from 4-6-98 to Unknown

   1. The leave of absence was initiated by the:        Worker ☑        Employer ☐
   2. Is the same or similar job guaranteed to the worker at the end of the leave?    Yes ☑    No ☐

☐ F. This worker refused an offer of work on (date)_____
   In the "REMARKS" section below please indicate the type of work offered, rate of pay, hours of work, and how the offer was conveyed to the worker.

☐ G. This worker was employed by an educational institution.

   1. The worker has a written, verbal, or implied understanding to return to substantially the same or similar position.    Yes ☐    No ☐
   2. Wages were earned while the worker was enrolled as a student and employed from: _____to:_____

REMARKS--Include any explanations you feel will help us make a determination on this claim, including other reasons for discharge and reason for suspension or leave of absence. Use the reverse side of this form if more space is needed.

*The employee is Presently on Medical leave. She is receiving income replacement through our agency sponsored disability Plan.*

Section 443.071 of the Florida Unemployment Compensation Law provides penalties for making false statements or failing to disclose material facts to prevent or reduce payment of benefits to otherwise entitled individuals.

CONTACT PERSON'S
NAME - Please Print: Carolyn Broughton     Date: 8-25-98

COMPANY TITLE OF
CONTACT PERSON  Director, Human Resource  Phone Number: (305) 341-7755

Job Site Address if different than mailing address:_____

Is your mailing address as shown on the reverse side of this form correct?    Yes ☐    No ☐

If no, what is your correct mailing address?

LES FORM UCB-412 (REV.

# P. EXHIBIT 5

ECONOMIC OPPORTUNITY FAMILY HEALTH CENTER
PERFORMANCE REVIEW AND DEVELOPMENT PLAN

EMPLOYEE NAME   Frankie Swain

POSITION   Director, Administrative Services

DEPARTMENT   Administrative Services

DATE HIRED   December 3, 1979

SUPERVISOR   Jessie Trice, Executive Director

CHECK ONE:

/ / PROBATION REVIEW

/X/ ANNUAL REVIEW

/ / OTHER _____

## GENERAL INFORMATION

The Performance Review Policy requires that the supervisor evaluate the work performance of each employee according to standards and objectives which have been established for the position. Kindly review the job description of each position.

The employee should do a self evaluation then the two of you meet to discuss and compare each item.

The final evaluation should be done in black or blue ink, please print or type when possible.

An overall rating of unsatisfactory or outstanding requires the approval of the Department Head and Executive Director prior to discussing with employee.

The form must be signed by the employee and supervisor. Employees refusing to sign the form should be sent to the Department Head for conference.

## RATING SCALE

Use the scale below to rate each category

/1/   UNSATISFACTORY:   Performance falls short of meeting the requirements of the job. An employee at this level is not meeting job accountabilities.

/2/   NEEDS IMPROVEMENTS:   Performance falls short in meeting some requirements of the job. An employee at this level is expected to improve and subsequen[t]ly satisfy all job accountabilities.

/3/   SATISFACTORY:   Performance meets all the job requirements of the job. An employe[e] at this level satisfies all job accountabilities.

/4/   ABOVE SATISFACTORY:   Performance regularly exceeds in meeting most requirements of the job. An employee at this level meets all job account- abilities and excels in the majority of them.

/5/   OUTSTANDING:   Performance consistently excels in meeting all requirements of t[he] job. An employee at this level demonstrates mastery in all job functions.

(1)

000666

# P. EXHIBIT 6

6. <u>Relating to Others</u>  □1 □2 ☒3 □4 □5

Does the person have proper (appropriate) relationship with
employees, co-workers, superiors, patients, and visitors?

Comments:  As she makes the transition from mid management to

senior management, she will become more secure, less threatened

and more effective.

7. <u>Communicating</u>  □1 □2 □3 □4 ☒5

Does the person communicate effectively orally and/or in writing?
Does he/she use proper lines of communication ?  Does he/she
make appropriate reports?

Comments:  As described above, her skills are excellent.

8. <u>Critical Thinking and Decision Making</u>  □1 □2 ☒X □4 □5

Does the employee analyze problems effectively?  Are the solution
to the problems reasonable and practical?  Does the employee dis-
cover problems on his own?

Comments:  Ms. Swain has tremendous potential.  Translating that

potential into performance depends upon her ability to internalize

her current top management position.

(4)

000669

3.   **Developing People (if applicable)**      [1]   [2]   [☒]   [4]   [5]

Is the person effective in selecting, motivating, and appraising
employees.  Does he plan for the growth of those employees he
supervises?

Comments:   Ms. Swain performs to the best of her ability.  She

needs to develop a greater tolerance fro human imperfections.

_____

_____

4.   **Planning and Organizing**      [1]   [2]   [3]   [4]   [☒]

Does the employee plan his work effectively?  Does he/she co-ordinate
the work with that of others?  Does he/she establish realistic
(practical) priorities?

Comments:   Excellent - Her skills in this area are surpassed and

equaled by none.

_____

_____

5.   **Delegating (if applicable)**      [1]   [2]   [☒]   [4]   [5]

Does the employee delegate responsibility to employees in keeping
with their abilities?  Does he/she assign the right work to the
right person?  Does he/she seek suggestions and recommendations
from persons he supervises.

Comments:   Her perfectionist manner creates dependence by staff.

_____

_____

_____

(3)

000668

PART  II:  WORK  PERFORMANCE  APPRAISAL

DIRECTIONS:

In this section there are 14 items which are intended to be used as a guide for your evaluation of an employee's job performance.  This does not imply that these are the only categories to be used.  If you wish to rate the employee on other matters, simply write these items on the appraisal form, or add another slip of pater.  If you feel that any of the categories do not apply to this employee, mark N/A (not applicable).

Below each category, space is reserved for comments.  Comments should be made as often as possible, but especially when you rate the performance of the employee as below average ( 1 or 2), or above average (4 or 5).  In other words, if you consider the employee to be outstanding, name some of those things which he does that make him an outstanding employee.

1.   Quality of Work          | 1 |   | 2 |   | 3 |   | x |   | 5 |

How does the quality of work compare with the established standards? Does the quality of work show that this person understands what the job requires?

Comments:     Ms. Swain surpasses the quality required.

She strives for perfection.

_____

_____

2.   Quantity of Work         | 1 |   | 2 |   | 8 |   | 4 |   | 5 |

How much acceptable work is produced?  Does the amount of work meet the standards for this job?

Comments:   When Ms. Swain internalizes, understands and accepts the

role of a Director, the quantity of her work will exceed the

acceptable level.

_____

(2)

000667

9.   <u>Vocational Development</u>         [1]   [2]   [3]   [4]   [5]

Is knowledge of the job up-to-date?  Does the employee prepare for changes in the job or the field?

Comments:   <u>She is learning on the job.</u>
_____
_____


10.  <u>Initiative</u>                    [1]   [2]   [3]   [4]   [5̶]

Does the employee look for and assume greater responsibility? Does the employee do the job with minimum supervision?

Comments:   <u>Has great initiative - needs reassurance.</u>
_____
_____


11.  <u>Objectivity</u>                   [1]   [2]   [3]   [4]   [5̶]

Does the employee respond to evaluation of his/her work in a positive way?  Does he/she accept suggestions which will improve performance of his/her work?

Comments:   <u>Welcomes positive and constructive criticism. Her</u>
<u>defensive posture will diminish as she becomes more secure.</u>
_____
_____

(5)

000670

12.  Creativity                    | 1 |    | 2 |    | X3 |    | 4 |    | 5 |

Does the employee make suggestions that help to meet the ob-
jectives of the department or his/her work assignment?  Does
he/she seek ways to improve the quantity or quality of work?

Comments:   Ms. Swain is very creative.  Those skills are not

readily apparent.

_____

_____


13.  Leadership (if applicable)    | 1 |    | 2 |    | X |    | 4 |    | 5 |

Does he/she direct employees effectively?  Can he/she create the
desire in others to achieve the objectives of the unit or de-
partment?  Does he/she make proper use of motivation and discipline
techniques?

Comments:   Ms. Swain has outstanding leadership skills but because

of her change in position, she has regressed in using those skills.

I have every confidence that change will occur and she will become

the leader she is capable of being.


14.  Attendance                    | 1 |    | 2 |    | 3 |    | 4 |    | 5 |

Does the employee have a record of absence or tardiness?  Is there
any kind of pattern developing in the area of absence or tardiness?

Comments:    Rarely absent.  Changes leave schedule to fit

Agency.

_____

_____


(6)

000671

15.   Attitude                    /1/   /2/   /3/   /4/   /5/

      Does the employee display a positive disposition or manner
      towards others - Co-workers, Supervisors, Patients, and Visitors?

Comments: _____ Very Good. _____

_____

_____

_____


16.   Courtesy                   /1/   /2/   /3/   /4/   /5/

      Does the employee display polite behavior and consideration
      toward others - Co-workers, Supervisors, Patients, and Visitors?

Comments: _____ Very Good. _____

_____

_____

_____


000672

1737 NW 3rd Avenue
Apt. C
Miami, FL 33136

To Whom It May Concern:

My name is Billy Gean Andrews and I am writing this letter to tell what I know about Ms. Lorna Beach-Allen's relationship with her staff and supervisors at Economic Opportunity Family Health Center, Inc. (EOFHC) in Liberty City, Miami.

I first met Ms. Beach-Allen when I, and a few other WAGES clients, were sent to her to do volunteer work in the M.A.P.I. Program, in May, 1997. Ms. Evelyn Peters, of WAGES, arranged for us to get job-training and office experience with Ms. Beach-Allen (our supervisor).

Among our group of volunteers was Joyce Green. She seemed to be very troubled when we first knew her, and also seemed to be very nervous. We were all sent for HIV and AIDS training by Ms. Beach-Allen, and was even invited to the AIDS Summit at the Hyatt Regency Hotel in downtown Miami. We passed our examinations at the Health Department and was further trained by our supervisor, to do outreach and education sessions in the community.

We liked working in the AIDS program, because Ms. Beach-Allen was very good to us. She was always polite and courteous, and never looked down on us because we were receiving welfare benefits. She treated us with respect and tried to help us in any way she could. She took a special interest in Joyce, because she did not want her to drop out of the program and risk losing her welfare benefits. After a while, Joyce started to open up and you could see that she was happy to be in the program.

Joyce later told us that she was being trained to take the place of Outreach Worker, Barbara Wilson, and that she may get a job with Family Health Center. Another volunteer, Doreen McLendon, and myself were very happy that at least one of us would get a job there. Joyce also told us that Ms. Beach-Allen had been pushing for her to get hired by talking to Dr. Brown, her supervisor, and also to Ms. Broughton in Personnel.

Eventually, Joyce was hired, and was very happy. She also told us that Ms. Beach-Allen had asked Dr. Willie Brown to buy clothes for her son at Christmas in 1997, which he did with his own money.

During part of the time that Joyce was working with Ms. Beach-Allen, some of the volunteers and myself were working in Ms. Frankie Swain's office. (Ms. Swain was Ms. Beach-Allen's first supervisor). She would always require us to

# P. EXHIBIT 6b

come over to her office to do work for herself and her staff. This left the M.A.P.I. Program very short -staffed. Our supervisor would always have to get and train new volunteers because Ms. Swain would take them away from her program.

I also noticed that Ms. Swain's employees who worked closely with her would be "on pins and needles" every time she called them to her office.  They would grumble and say things like, "What did I do now?"  They were very much afraid of Ms. Swain who was usually verbally abusive to them. We did not like going over there, either, and preferred to work with Ms. Beach-Allen, or counselors like Mr. Marvin Ellis or Ms. Jackson.

I must say again that Ms. Beach-Allen really took an interest in Joyce, and tried to help her overcome her fear of cancer that she thought she had.  We noticed that she always treated Joyce with respect and compassion, and tried very hard to help her succeed. Joyce later left the program after they (EOFHC) told her that they had no funds available to pay her. This was a few months after Ms. Beach-Allen was thrown out of her position as Program Coordinator.  Ms. Beach-Allen really worked hard to make the program succeed, and was trying very hard to get jobs for everyone.

While at EOFHC, I had heard that Ms. Chantal Hafke, was hiring a lot of people that she knew, to work at the Center. But she never hired us, the volunteers who helped the staff do a lot of their work. Some of the staff members were jealous that Ms. Beach-Allen had volunteers to work with her, and they didn't. They complained openly about it, and Ms. Swain sent most of us to different offices to work.

Please note that Joyce Green never complained about any harassment, or mistreatment by Ms. Beach-Allen, throughout the time that I worked there with her. If you need any further information, you may contact me at: (305) 576-9889. Thank you.

Respectfully Yours,

Mrs. Billy Gean Andrews
(Former volunteer)

2

9/14/98

Spoke with Peggy Griggs at
Canada Life.

She said that Margaret Clark
of Canada Life spoke with
Dr Rosen he said he examined
her & gave her release to return to
work her Return date is Sept 8, 19

Hygeia Hyatt —

# P. EXHIBIT 7



**FAMILY HEALTH CENTER, INC.**

ECONOMIC OPPORTUNITY
FAMILY HEALTH CENTER
5361 N.W. 22nd Avenue
Miami, FL 33142
Tel: (305) 637-6400

February 10, 1999

Florida Department of Labor and Employment Security
Division of Unemployment Compensation
8300 NW 53rd Street, Suite 200
Miami, Florida 33166-7711

Re:    Claim for Unemployment Benefit for Lorna Beach-Allen
       SSN: 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

Dear Sir/Madam:

I am hereby requesting a hearing regarding the redetermination decision made for claimant, Ms. Lorna Beach-Allen.

A doctor's determination of her ability to perform the functions of a position offered to her was requested and was received. According to her doctor she is able to perform the functions of her job description.

Ms. Beach Allen is able to return to work. She has not been terminated.

Your response is anticipated.

Sincerely,

Carolyn Broughton
Director, Human Resources Management

# P. EXHIBIT 8





Accredited by Accreditation Association for Ambulatory Health Care, Inc.

```
FLORIDA DEPARTMENT OF LABOR AND EMPLOYMENT SECURITY
DIVISION OF UNEMPLOYMENT COMPENSATION       SOCIAL SECURITY NO: 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
8300 NW 53RD STREET  SUITE 200          CLAIM FILED EFFECTIVE: 08/02/98
MIAMI          FLORIDA                      CLAIM OFFICE NO: 3677
               33166-7711                        ISSUE CODE: 1 01 440100
                                                DATE MAILED: 05/19/99
                                                ADJ NAME: 0 0 3038
```

## SECTION I. REASON FOR DETERMINATION

THE CLAIMANT WAS DISCHARGED AFTER THE EMPLOYER REPLACED THE CLAIMANT WITH
ANOTHER WORKER.  NO INFORMATION HAS BEEN SUBMITTED WHICH SUBSTANTIATES
MISCONDUCT.

## SECTION II. DETERMINATION

IN ACCORDANCE WITH SECTION 443, FLORIDA STATUTES:
BENEFITS ARE PAYABLE BECAUSE:
THE DISCHARGE WAS FOR REASON OTHER THAN MISCONDUCT CONNECTED WITH THE WORK.


ANY BENEFITS RECEIVED FOR WHICH YOU WERE NOT ENTITLED ARE OVERPAYMENTS AND
SUBJECT TO RECOVERY.

## SECTION III. EMPLOYER CHARGEABILITY

BENEFITS PAID WILL BE CHARGED TO THE EMPLOYER'S ACCOUNT.

## SECTION IV. APPEAL RIGHTS

THIS DETERMINATION WILL BECOME FINAL UNLESS YOU FILE A REQUEST FOR A HEARING
WITHIN TWENTY CALENDAR DAYS FROM THE MAILING DATE OF THIS NOTICE.  THIS REQUEST
MAY BE FILED IN PERSON OR BY LETTER TO THE OFFICE WHERE THE CLAIM WAS FILED
AND MUST EXPLAIN THE BASIS OF THE PROTEST.  THE POSTMARK SHALL BE CONSIDERED
THE DATE OF FILING BY MAIL.

IF UNEMPLOYED, YOU MUST CONTINUE REPORTING TO THE DIVISION UNTIL ALL
REDETERMINATIONS/APPEALS ARE RESOLVED.


```
        CLAIMANT / AGENT ADDRESS            EMPLOYER / AGENT ADDRESS

      LORNA     M BEACH ALLEN            ECONOMIC OPPORTUNITY FAMILY
      18800 NW 2ND AVENUE APT #219D      HEALTH CENTER INC
      MIAMI              FL 33169        5361 NW 22ND AVE
                                         MIAMI              FL 33142-8035
```

LES FORM UCB-45 [REV 02/]

# P. EXHIBIT 9



*ECONOMIC OPPORTUNITY*
# FAMILY HEALTH CENTER, INC.
5361 N.W. 22nd AVENUE   MIAMI, FLORIDA 33142   TELEPHONE (305) 637-6400

Management Performance Evaluation of Lorna Beach-Allen
(Evaluation Period: December 30, 1996 - June 30,1997)

EMPLOYEE'S COMMENTS

1. ACHIEVEMENT OF OBJECTIVES: Rating - Satisfactory

Comments:  The M.A.P.I. Program was in very poor condition at
the time that I was appointed to the position of Program
Coordinator on March 3, 1997. Prior to that, I was the
Administrative Assistant to Ms. Frankie Swain, Special
Populations Department.

During the second week of my employment,  I became an
unwitting witness to the sad state of affairs that
accompanied the program. I did not realize then just how bad
things really were during the early part of this year. My
first involvement came when I was asked to work late on or
about the night of January 9, 1997. Auditors from the
Department of Health, Tallahassee were expected the next day
for a "technical visit" which Ms. Swain referred to as an
audit. I spent fifteen hours that day and night (from 8:00
a.m. to 11:00 p.m.) typing reports, flyers and work plans,
among other things. Most of that time (approximately eight
hours straight) was spent working on the computer.

Every time I and my co-worker announced that we were tired
and hungry and ready to go home - 7:00 p.m., 8:00 p.m.,
10:00 p.m.- Ms. Swain would beg myself and Indra (Amy)
Rampersad to stay. There was no food, no drinks, nor breaks
provided for us as we worked late into the night without
the promise of monetary compensation or future time off from
work.

The reason for the last-minute organization of files was the
fact that the contract was not being followed.  The prior

# P. EXHIBIT 10

Program Coordinator, Lady Jenkins, had been fired in December and the current Program Coordinator, Phillip Culver had recently been appointed to that position. Because of the death of his father, Mr. Culver took an extended leave of absence and then later resigned. This left the M.A.P.I. Program and its staff of four people without direct supervision.

This lack of direct supervision (for a period of approximately two months) caused a backlog of work. In addition, the unsupervised staff, was free to wander around the center, doing exactly as they pleased. They were observed by many people, including myself, to do absolutely nothing for most of their work day. On occasion, Ms. Swain would jokingly make light of the fact that she could not locate Education Specialist, Mr.Kenneth Duncan when she needed him. Sometimes he would be located at his home when he should be at work. Subsequently, when I took over the program there was much back work to be done i.e. work that should have been done on a daily basis, but was cast aside as the staff "drifted along on their merry way." Another staff member, Peer Counselor Ms. Barbara Wilson, was constantly attending various AIDS-related meetings, on company time. This practice continued until one day Ms. Swain finally put her foot down and prohibited her from going to those meetings during her working hours.

The program assessment that was conducted by the Tallahassee team on April 16, 1997, was the culmination of many weeks of hard work by myself and the M.A.P.I. staff, after my appointment as Program Coordinator on March 3. We were able to receive a favorable assessment after I worked many long hours, sometimes as late as 11:00 p.m. On the night of April 15, we were ordered by Ms. Swain to work late into the night. She said to us "Nobody's going home tonight - not until all the work gets done." Referring to my staff, she said, "You all will not be paid for this work. You have already been paid for it."

While Ms. Swain and three of the staff members left at 2:30 a.m. (April 16), I remained until 3:30 a.m. to get as much done as possible. (My time card for that period, and the security guard on duty that night can attest to that fact).

Because of my hard work and dedicated efforts, the M.A.P.I. Program has been able to accomplish and sometimes exceed the goals that have been set by the Department of Health, as per our contract. I have been able to ensure

that the staff, which lost two of its members due to staff cuts by Ms. Swain, has consistently abided by the edict of the Health Department.

I knew that I had begun to turn things around, especially with regard to how my formerly "renegade" staff worked when I was paid a compliment by an observer. Mr. Marvin Daniel, former Manager of Site #240 where our offices are located, informed me in April that he had noticed a big difference. He said, "People are coming to work now." Apparently, prior to my arrival, staff members rarely spent time in their office. This observation was reiterated by Ms. Kalenthia Nunnally, President of the Teen Pregnancy Prevention Center, Inc. who shares our office space.

In addition to the work that I was doing as Program Coordinator, I was ordered by Ms. Swain to still perform the functions of her Administrative Assistant. Despite the fact that she had hired a temporary assistant, I was instructed to complete some old tasks, and some new ones, for more than two weeks after my new appointment. In other words, I was performing the jobs of two people. While I juggled with these responsibilities, her new assistant, Ms. Rosalind Haygood, occupied her time by cleaning out and reorganizing my old office which she now occupied.

Although it was very unfair to me, I did not complain to Ms. Swain. In fact, at the request of Dr. Fatima Zafar, I wrote the words of nomination for Ms. Swain to receive the 1997 Gabe Kruks Award at the Annual Ryan White conference in Washington, D.C. Because of my sincere words of admiration regarding her work with special populations, Ms. Frankie Swain won the award!!! She later went on to receive an all-expenses paid trip to Houston, Texas, and an honorable mention (with photograph included) in a trade newsletter!

2. DECISION MAKING AND JUDGEMENT: Rating - Needs Improvement

Comments:  When I began my duties as Program Coordinator, I was put in charge of a staff that was used to being unsupervised, for the most part. This staff also resented supervision because it meant that their freedom would be curtailed. By freedom, I mean the kind they exercised at work: being able to "goof off" at will; leaving the job site

without permission; not having anyone looking over their shoulder during the day; attending unauthorized meetings without permission, on company time; not being held accountable for their work.

Even before I was told that I was selected for the position, staff members complained to other department staff members that they hoped that I would leave things the way they are; that things were running smoothly and that they hoped that I would not come in and change things.

There was hostility shown to me by one staff member in particular who felt that he should have been given the position. He had boasted to anyone who would listen that he would be the next supervisor. Therefore, when he was not chosen (because of lack of educational qualification, i.e. a college degree, lack of maturity and leadership ability, among other things), he decided to make my position very difficult.

There were times when I was yelled at over the telephone by him; when my requests for work to be done were questioned; when I was blatantly disobeyed; when my role as supervisor was negated; when he broke the chain of command and "went over my head" in an effort to have his own way; when he would disappear from the job site for hours without permission or explanation; or when he would spread falsehoods about me to other supervisors.

Other staff members would blatantly refuse to do as I asked; would turn over assigned tasks to others; would leave work undone; would constantly find excuses to leave their work sites; would question my authority; would go to my supervisor with the most trivial of complaints, with the knowledge that she, in her dislike for me, would entertain their stories; would yell at me and argue as to why they should not do as I asked.

At one time or another, they all resented my supervision, until they started to know me as a person. Until that time, I never had the backing of my supervisor. In fact, she displayed absolute disrespect for me in front of my subordinates. This was done by yelling and screaming at me in their presence; constantly interrupting my speech and telling me to "shut up" in front of my staff; encouraging them to to rude to me; disregarding my explanations in their presence; belittling my ideas during staff meetings; ordering me to be their "go-fer" and note-taker during meetings; siding with them, even though they were rude and very disrespectful to me by saying that "They didn't know";

making excuses regarding their working capabilities i.e. "They can't do this, or "They can't do that."

On many occasions, Ms. Swain ordered me to do not only my work and her work, but also my staff's work (see enclosed list of "Program Expectations - MAPI." This was in addition to my own job description.

With regards to responding to work problems, I took the initiative in accessing a new source of volunteer labor in May. Having been told that my staff would be cut by two people, I contacted the WAGES Program in an effort to recruit additional help. Our contract with M.A.P.I. also requires us to use volunteers to help spread the message of prevention.

After recruiting and training volunteers for the program, I offered their assistance, on a temporary basis, to the Special Populations Department staff. Eventually, most of my volunteer staff was "commandeered" by Ms. Swain. In fact, she demanded that I release almost all the volunteers to work in different capacities at the main site. This left the program severely understaffed, causing a much heavier workload on its three members. Despite my complaints, she claimed that they belonged to her, and she could do with them as she pleased.

Volunteers would complain to me about the harsh words that they were subjected to while in the company of Ms. Swain. She also made false accusations about some of them. Some of them would cringe when told that they had to work in her office. Others stated that if they could not work in the program, they would leave, even if it meant having their welfare benefits sanctioned or cut.

Because of the loss of those volunteers, I had to recruit more people from the WAGES Program. They were eventually taken from me in one way or another. Ms. Swain would call and demand that I send my volunteers to her office, or Dr. Dorothy Holmes' office, leaving my program to suffer without adequate staffing.

During the first two months as Program Coordinator, I had to ensure that not only my staff and volunteers, but myself, received HIV/AIDS/STD/TB training and certification, as per our M.A.P.I. contract. It was crucial that this training take place because no one, including myself was authorized to do education or outreach without the necessary training. I made it a priority to have that done, also to have the

backlogged work accomplished. In fact, it is because those duties were prioritized that we were able to receive a favorable rating from the State of Florida Department of Health assessment team.

In addition, I was required to attend meetings, training sessions and conferences that took me out of the office for several days, at different times. I also had to deal with personal grief - two of my uncles died on the same day, and later two of my cousins died one month apart!!

Ms. Swain constantly gave me contradictory instructions. For example, she had told me that she should be consulted before I made any decision with regard to the program. In following her order, I advised Mr. Ellis (HIV Counselor) to consult with her about a box of condoms that he wanted to "borrow" from the M.A.P.I. Program. He was in her office at the time. I was at my office at the Annie Coleman Gardens Housing Development.

After Mr. Ellis asked her about the condoms, she called me on the telephone and yelled at me, in his presence. She told me, "Can't you make a decision?" You say you are a manager?" I informed her that she had told me that she needs to be consulted before anything was done. I also said that I was just following her order. She continued to yell at me and finally gave her approval for Mr. Ellis to take the condoms. After witnessing Ms. Swain's extreme behavior, Mr. Ellis later said to me, "I guess you're dammned if you do, and dammned if you don't." Ms. Swain subsequently gave me a written warning based on that incident.

Ms. Swain wrote in her evaluation that I "prolonged discussions, becomes argumentative and defensive, etc." I beg to differ!! During mandatory M.A.P.I. staff meetings which usually lasted sometimes from 1-5 hours, Ms. Swain would purposely keep us from performing our duties. There were times when we would request that the meetings did not take place as often, or for such long periods because it gave us less time to do our jobs. She would insist on it, plus she would have me come in an hour earlier for a private meeting.

There were times when Mr. Duncan or Ms. Wilson would beg to leave because they had a scheduled education or outreach session, but she would prohibit them from leaving. These meetings would sometimes start at 1:30 pm and end at 6:00 pm, or 6:15 pm - long after the end of the work day! Some of the staff would miss rides home because of this. I usually ended up taking them home when I left - which would put me out of my way. One staff member lived in Miramar at the time.

Usually,   some of the part-time staff were required  to stay
long after their 4-5 hour day was over (without extra pay).
I always wondered   why   Ms. Swain   insisted  on  those  long
meetings.  I came to realize, after reading the M.A.P.I.
contract, that it was an attempt to justify her then 5%, now
10% salary as Project Director of the M.A.P.I. Program!!

Sometimes the meetings consisted partially of a discusssion
of the purchase of Family Health Center tee-shirts for use
during outreach.  Ms. Swain would insist that we bought them
from our own paychecks.  Since we could not afford to do
that, she would threaten our jobs, saying, "You have to pay
for them yourselves, or you can look for another job!" We
felt that this was unfair since the tee-shirts would be used
to represent the Agency, and could be considered a uniform.

With   that   in  mind, please  note  that  with  the  change  in
supervision  of  the  M.A.P.I. Program, a  vast  difference  in
leadership was noticed. When Dr. Brown, (who was recently
appointed to be our boss) was approached about the purchase
of  tee-shirts  for  the  program,  he  responded  without
hesitation or threats. By the next day, we had money to buy
the tee-shirts, which we now use for outreach sessions. It
was like a breath of fresh air!

As a matter of fact, one of my staff (Ms. Barbara Wilson)
commented that we used to spend hours in Ms. Swain's office
having numerous discussions about these tee-shirts. What a
difference!

In the presence of my staff, Ms. Swain would raise her voice
and openly criticize me; she would also accuse me of certain
things. Whenever I tried to explain or defend myself, she
would tell me to either accept what she said, or apologize
for whatever she felt I did wrong.  Even when the staff would
speak  to me rudely, or disobey me, she would ask me  to
apologize to them.  She never sanctioned them for refusing to
follow my lead. When their work was poor, or they neglected
to do it, she would not chastise them in any way.   Instead,
she would tell me that they could not do whatever it was
because they do not have the skills.  She would constantly
pamper them in my presence, and act like they could do no
wrong.

She tried to destroy my self-esteem by belittling me in front
of my staff, subsequently they lost what little respect they
had for me.  Because they knew that she would side with them
against me, they would sometimes ignore my work requests, or
yell at me.  They would then complain to her that they did
not like the way I spoke to them. She would believe them!!

Despite all of the obstacles I encountered, I was still able to accomplish the tasks that were assigned to me. I should be given a medal, not a bad evaluation.

PERSONNEL DEVELOPMENT:   Rating: Needs Improvement

With regards to the training and orienting of new employees, I took the initiative to recruit volunteers to assist in the program after Ms. Swain drastically cut my staff by two people.

Knowing that a reduction in staff was imminent, I diligently began to provide training for the WAGES volunteers, starting on May 28, 1997. Prior to that, I had ensured that all staff members had attained their AIDS 104 and AIDS 105 certification. This included Manuel Reyes, Peer Counselor, who, since his hiring in December 1996, was not fully trained to provide outreach services.

Ms. Swain complimented me for the work I was doing with the volunteers, at the Hyatt Regency Hotel during the HIV/AIDS Summit on May 30, 1997. I told her that I had four new volunteers present at the Summit, and that five of them had attended an STD training session the previous day, she said to me, "You really have the hang of the program now. That's good."

Volunteers also attended AIDS 101 and AIDS 104 training sessions and received certification in both. They were also trained in outreach procedure and clerical work. I also attended training sessions, and received certification in AIDS 101, AIDS 104 and AIDS 501.

In addition, I received an STD Training Workshop certificate from the Health Crisis Network; a certificate for two-day attendance at a Grant Writing seminar (which was cut short by one day at the insistence of Ms. Swain); a certificate of attendance and participation in a Program Evaluation workshop; a certificate of attendance at the mandatory HiV Prevention Training Workshop in Orlando, among others.

I have counseled staff members about their work ethic on many occasions. I have stressed the need to arrive to work on time, and to get the work done. For the most part, some of it fell on deaf ears. Those who were displeased with what I said, made a "beeline" to Ms. Swain's office because they did not like what I said, or "how I spoke to them." She, for the most part, entertained their gripes, and basically allowed

them to do as they pleased. They would have a myriad of excuses for spending time at the Main Center, as opposed to working at their desks. They would "disappear" without telling me where they were going. I would later get reports that they were seen in various offices, especially Ms. Grant's.

At one point, I asked Ms. Grant if she would assist me in keeping them focused on their jobs by notifying me whenever they showed up at her office. Before she could answer, Ms. Swain retorted, "Why does Grant have to help you? You are the supervisor, you should discipline them." Consequently, my staff was able to do as they please without any accountability on their part. I did not get the support of other managers, nor of my supervisor, Ms. Frankie Swain.

I tried to motivate the staff by telling them that if we all did the best job that we could do, the program would most likely be expanded, more revenue or grants may be won, and as a result, salaries could be increased. I tried to explain that the job that they were doing was important because lives could be saved through education about HIV/AIDS. I encouraged them to go to school and to further their education. I also told them that they had the potential to achieve more for their lives. Sometimes they listened, sometimes they did not.

4. PLANNING AND ORGANIZING: Rating - Needs Improvement

Ms. Swain indicated that I "inconsistently meets deadlines." I would offer that a lack of equipment; an unruly staff; an abusive boss; and a heavy workload are all reasons why some deadlines could not be met. However, for the most part, any deadlines that were crucial to the program's continuation of funding, were met with much effort.

Without the use of a typewriter, word processor, computer, fax machine, or copy machine, I was able to get my work done in a professional manner. Despite promises of access to the computer, by Ms. Swain, many times I was forced to delay the typing of my reports because I was refused access to it by either Ms. Swain, Ms. Hafke, Ms. Grant, Ms. Haygood or Ms. Tolentino. There were times when I was told to get off the computer because someone wanted to use it. This was especially disappointing because I had to leave my office, secure the building (at times), then make my way over to the Main Center in order to use the equipment there.

There were occasions when I would call ahead of time to reserve use of the computer, only to find out when I got there, that someone else was using it; or that I would have to wait another 2-3 hours before I could use it. Sometimes,

the only time that I could use the computer was after 5:30 pm. This resulted in many late nights spent in the office trying to get my work done.  Many times I did not leave work until 10:00 or 11:00 pm!

On numerous occasions, Ms. Swain would prevent me from doing my job by summoning me to her office for the most trivial of matters.  She would then keep me waiting around for hours at a time, until she was ready to see me. There were times when I literally spent days at her office, without even seeing mine.  I believe that she took pleasure in making me wait on her, and then put pressure on me to accomplish my tasks on time.

She would summon me from my office, the very first thing in the morning, saying: "Beach-Allen, come to my office now, I have to talk to you." She would have me make four or five trips per day to see her.  Then she would keep me there while she saw other people in her office.  There were times when I wanted to go to lunch, and she refused to let me go. She took pleasure in starving me. Many people can attest to the fact that Ms. Swain wasted much of my time.  In fact, whenever she would call, some of my staff would say, "What does she want now?"  They (staff members) also resented being summoned to her office because it meant that they would waste three to four hours, especially on Thursday afternoons.

The standards that I developed for the work unit were undermined by Ms. Swain. Because they witnessed her abusive behavior towards me, they lost respect for me.  Eventually, some of them lost respect for her, as they were able to see that she really did not care for them either. When they were against me, she sided with them.  When my staff and I began to develop a more cohesive unit, Ms. Swain turned against me more.

Evidence of her abusive behavior could be seen in the way the Special Populations Department has always exhibited a vast turnover of staff.  Within a period of approximately six months, Ms. Swain had four administrative assistants. Most of us left that position because we were fed up of the poor working conditions.

With regard to my status, I would like to say that if my job performance was so bad, why did she wait so long to give me an evaluation?  Also, why did she not terminate me?  The probationary period is the most opportune time to get rid of someone whose work is not up to par.  Why the delay?  I asked Ms. Swain why she did not fire me, instead of "beating around the bush." Her response was, "Why don't you resign?"

It is my opinion that this evaluation is an attempt to force me to resign, because the reasons for termination are unfounded. Hopefully, this commentary should help to shine some light on what really took place under the direction of Ms. Frankie Swain, and what obstacles I have been able to overcome in an effort to get the job done.

Lorna Beach-Allen
Program Coordinator
10/21/97



ECONOMIC OPPORTUNITY
# *FAMILY HEALTH CENTER, INC.*
5361 N.W. 22nd Avenue * Miami, FL 33042 * Phone:(305)637-6400

M E M O R A N D U M

To:   Dr. Clarence Lawrence, COO
From: Ms.Lorna Beach-Allen, Program Coordinator
Date: October 21, 1997
Re:   MANAGEMENT PERFORMANCE EVALUATION

------------------------------------------------------------

The attached "Comment Sheet" is respectfully submitted in response to the copy of the "Management Performance Evaluation" (also attached) of my job performance by my former supervisor, Ms. Frankie Swain, Special Populations Department.

It should be noted that this evaluation (for the normal probationary period of December 30, 1996 - June 30, 1997) was given to me almost two months after the end of the said period.

I was summoned to Ms. Swain's office on the afternoon of August 22, 1997 at approximately 2:00 p.m. After informing her of the rain that was falling at that time, she told me to come to her office as soon as I could.

I arrived at her office at 2:30 p.m., only to be kept waiting for more than an hour while we awaited the arrival of Ms. Marcia Grant, Program Manager. Ms. Grant, as I was told, had been invited by Ms. Swain to sit in on my evaluation session. Although I knew that this was in violation of the "Confidential" nature of my job performance evaluation, I elected to keep this knowledge to myself. This session did not start until 3:40 p.m.

Ms. Swain breached the "confidential" aspect of my performance evaluation by having one of my peers, another manager, become privy to her unfair, slanderous and libelous assessment of my work, my mental capabilities and my character. In fact, the entire session was decidedly defamatory in nature as Ms. Swain proceeded to openly criticize my job performance and my decision-making or my "judgement" (as she called it).

P. EXHIBIT 11

I take issue with this evaluation of my performance, mainly because I believe it to be a thinly disguised attempt to retaliate against me. This retaliation is based on what I believe to be a personal vendetta in which Ms. Swain has been engaged over the past few months. I believe that it is also based on personal ill-feelings (including envy, dislike, and anger) that she has harbored towards me. The fact that I met with you concerning her written warnings about trivial matters is another reason for her unfavorable evaluation.

I know that Ms. Swain was not pleased that I had met with you, and that I had asked you for an appointment to talk with you about the harassment that I was experiencing at that time. In fact, the very next day she called me on the telephone at my office and said the following:

"I don't want you to feel that I am picking on you, but from now on all managers have to report to me when they come in to work; when they go out to lunch; when they come back from lunch; and when they leave for the day. It's not just you - Grant and Hafke have to do the same thing. Since you are in another location, I need to know when you come and when you go."

She then again stressed the fact that she was not picking on me. Since Ms. Grant and Ms. Hafke both worked in her office, I knew that this directive was not aimed at them, but only at me.

Also, since I had been appointed to the position of M.A.P.I. Program Coordinator, she had never asked me to do such a thing. I was also the only manager in her department who was asked, by her, to punch a time card. The other managers would often arrive to work late and leave early without punching a time card. I was the only one singled out to account for my time.

In addition, I was the only manager who was directed to clean my office space. This cleaning included: sweeping and mopping of floors; throwing out garbage; cleaning bathtubs and washbasins; cleaning a refrigerator and kitchen counters; scrubbing toilet bowls and washing walls. All of this had to be done by me during office hours. I was also expected to secure the building at the end of the day. No other manager was expected to do those things. I knew this to be personal harassment, and possibly, discrimination of some form.

Ms. Swain's evaluation of my performance, came as a surprise to me in some respects. This is in light of the fact that she has praised my work to members of the

executive board - Ms. Armbrister and Mr. Moore, in
particular. She has also publicly congratulated me at our
departmental meetings for bringing the M.A.P.I. Program up
to its current level of efficiency. Staff members can
attest to that fact, and also to the look of surprise on my
face when she directed those compliments towards me.

It should be noted that Ms. Swain's praise of my work came
before my meeting with you. With this in mind, I hope you
can understand why I believe that this evaluation, and her
recommendation that I function in a non-supervisory
capacity, is vindictive, malicious and spiteful in nature.

Dr. Lawrence, I am presently writing a chronicle of the
mental, verbal, and physical abuse, and harassment that I
endured at the hands of Ms. Swain. Because of her open
aggression towards me, I have also been subjected to verbal
abuse (with the use of obscenity and profanity) by Ms. Grant
and public ridicule by Ms. Hafke. They have since tried to
carry on the tradition of abuse that was first perpetrated by
Ms. Frankie Swain.

[Please note that at the time of my evaluation session,
Ms. Grant, to my surprise, said to me, "I never wanted you
to become the Program Coordinator." This indicated to me that
there was some form of resentment felt by Ms. Grant towards
me because of my position].

The events that have been documented, have been witnessed by
several people who are willing to testify to the veracity of
the facts as they occurred. Because of the traumatic nature
of my work environment, I still bear the emotional scars and
physical pain caused by Ms. Swain's mental and verbal torture
and her "reign of terror."

This period of "involuntary servitude" as I feel compelled to
call it, may be over because of the change in supervision,
but the nightmarish memories remain indelibly etched in my
mind.

At our last meeting, I had requested that the warnings given
by Ms. Swain be removed from my personnel folder because of
their baseless nature. I would also like the libelous
"evaluation" to be expunged from my record. The succeeding
chronicle should substantiate my claim of harassment,
and quite possibly, discrimination.

Based on the foregoing, I am now respectfully requesting that
the attachments to this correspondence be included in my
personnel file. This request is being made in order to
refute the derogatory and defamatory written comments made by
Ms. Swain in her "evaluation" of my job performance.

<u>Please Note: During the five months prior to her evaluation of me, Ms. Swain had conducted evaluations of some of my staff members by asking them to WRITE THEIR OWN EVALUATIONS!! Of course, she agreed with most of what they wrote about themselves. I was never given that opportunity.</u>

I am also respectfully requesting that my current salary of $25,000.00 per year, as Program Manager, be adjusted to reflect the lawful salary of $26,250.00, which is indicated in the M.A.P.I. contract with the Florida Department of Health.

Ms. Swain has denied my receipt of the actual salary in an effort to remain spiteful and vindictive towards me. This was done despite the promise to me that I would have the increase at the beginning of the new contract year, July 1, 1997. I do also request all retroactive monies that are owed to me from July 1, 1997 to the present time.

Thank you for your time and attention to this matter. Please let me know if you need clarification on, or witnesses to, any of the events leading to the information which is hereby submitted to you.

Attachments:   Copy of Management Performance Evaluation
                Employee's Comments

cc:

    Dr. Willie Brown, Sr. Vice President
    Ms. Carolyn Broughton, VP Human Resources



ECONOMIC OPPORTUNITY
# *FAMILY HEALTH CENTER, INC.*
5361 N.W. 22nd Avenue * Miami, FL 33042 * Phone:(305)637-6400



M E M O R A N D U M

      TO: CAROLYN BROUGHTON
          VICE PRESIDENT/H.R.M.

   FROM:  WILLIE L. BROWN, Ph.D.
         SENIOR VICE PRESIDENT/CHIEF

   DATE:  NOVEMBER 10, 1997

SUBJECT:  LORNA BEACH-ALLEN

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Upon meeting with Dr. Clarence Lawrence and after careful review of
Ms. Beach-Allen's evaluation, it has been decided to grant her
permanent full-time status.

In conjunction with this decision, Ms. Beach-Allen should receive
a 5% increase; effective next pay period.

Ms. Beach-Allen has been advised that any correspondence placed
within her personnel file, by her former supervisor, cannot be
extracted but may be refuted by her.

WLB:sp

cc:  Dr. Clarence W. Lawrence
     Chief Operating Officer

     Lorna Beach-Allen
     Manager/MAPI

P. EXHIBIT 12



# ECONOMIC OPPORTUNITY
# FAMILY HEALTH CENTER, INC.

5361 N.W. 22nd AVENUE • MIAMI, FLORIDA 33142 • TELEPHONE (305) 637-6400

**BOARD OF DIRECTORS**

**OFFICERS**

Alvin D. Moore, Jr.
*Chairperson*

Father J. Kenneth Major
*Vice Chairperson*

Ellen S. Heidt
*Secretary*

Priscilla Beatty, CPA
*Treasurer*

**BOARD MEMBERS**

John Aldrich
Vashti C. Armbrister
Elizabeth Boze
Cecilia Crosby, DDS
Albert C. Ferguson
Orange Hayes
Beatrice Louissaint
Alan S. Pareira
David F. Parish, Esq.
Joseph Patterson, PhD
Jessie Robinson
George Simpson, M.D.
Rosa Thornton, R.N.
Sonny Wright

**HONORARY MEMBERS**

The Honorable Carrie Meek

Jessie Trice, RN, MPH
*President & CEO*

**MISSION:** The mission of the Economic Opportunity Family Health Center, Inc., (EOFHC) is the provision of high quality comprehensive health care and substance abuse treatment services in an efficient and humanistic manner to poor, medically underserved clients who reside in a major segment of urbanized Dade County, Florida.

**GOAL:** To improve the quality of life for residents of Liberty City, Hialeah, and Little Haiti.

**FACILITIES:**

**MAIN FACILITY**
5361 N.W. 22ND AVE
MIAMI, FLORIDA  33142
(305)637-6400

**REAVES HOUSE: WOMEN'S RESIDENCE**
2984 N.W. 54TH STREET
MIAMI, FLORIDA  33147
(305) 637-6498

**HIALEAH MEDICAL CENTER**
490 E. HIALEAH DRIVE
HIALEAH, FLORIDA  33010
(305)887-0004

**NORTHWEST DADE CENTER**
4175 W. 20TH AVENUE
MIAMI, FLORIDA  33012
(305) 825-0300

**NORTH SHORE MEDICAL ARTS BLDG.**
1150 N.W. 95TH STREET, SUITE 110
MIAMI, FLORIDA  33150
(305) 696-7759

**JAMES E. SCOTT SATELLITE CENTER**
7200 N.W. 22ND AVE
MIAMI, FLORIDA  33142
(305)835-8122

**TRICE CENTER FOR LEARNING AND HEALTH: DAY CARE**
901 N.W. 54TH STREET
MIAMI, FLORIDA  33127
(305)759-3700

**FLORIDA MEMORIAL COLLEGE**
15800 N.W. 42ND AVENUE
MIAMI, FLORIDA  33056
(305) 626-3760

**COPE CENTER NORTH(PREGNANT TEENS)**
9950 N.W. 19TH AVENUE
MIAMI, FLORIDA  33147
(305) 691-4547

**FUNDING SOURCES:**
U.S. PUBLIC HEALTH SERVICE
FLORIDA DEPT. OF H.R.S.
MEDICAID/MEDICARE
SELF-PAY

# P. EXHIBIT 13



DEPARTMENT OF HEALTH AND
REHABILITATIVE SERVICES

Accredited by Accreditation Association for Ambulatory Health Care, Inc.

SERVICES

| | | |
|---|---|---|
| General Medicine | Pediatrics | Immunizations |
| Hearing | Women Infant & | EPSDT Screening |
| Nutrition | Children (WIC) | Gastroenterology |
| Radiology | Laboratory | Pharmacy |
| Family Planning | Dental | Transportation |
| Obstetrics | Health Education | Child Care |
| Podiatry | Orthopedic | Ophthalmology |
| Surgery | Gynecology | (Prescription |
| Psychiatry | Internal Medicine | Glasses provided, |
| Neurology | Dermatology | if needed) |
| Optometry | HIV/AIDS | Addictions |

The general community of Dade County in which the EOFHC exists and operates represents a multicultural, multiracial, and economically diverse environment.  This environment includes a set of often conflicting and confrontational issues, agendas and priorities.  The specific  community we serve is far less heterogenous in terms of socioeconomic and racial characteristics, nevertheless, it presents its a unique set of social and health care issues and problems.  Three very separate communities are identified primarily by race and ethnicity, and characterized by an uneven distribution of economic resources. Poverty, however, is the unifying tread.  Our service population reflects a racial and ethnically diverse group, most of whom represent the poor and working poor.

The EOFHC operates, in addition to the Main Facility, six satellite centers throughout its service area.  One Center administers specifically to the health care needs of a growing elderly population.  Adjacent to the Elderly Services Health Center is a model daycare for children: 6 weeks to 5 years of age.   Another Center, Scott-Carver, is located in one of the largest public housing units in the County.  The fourth satellite center is located in Hialeah, a predominately Hispanic community adjoining the Liberty City area.  The fifth and sixth satellites house the women's and men's substance abuse residential centers.

Additionally, comprehensive primary care is provided to students at Florida Memorial College and COPE Center, North, a Dade County Public School for expectant teenage mothers.

The service area of the EOFHC comprises an area locally known as Liberty City, portions of Little Haiti, and Hialeah.  Liberty City is an area that is predominately Black, with over fifty percent (50%) of its residents residing at or below the poverty level.  The area is the site of at least eight (8) Federal low-income housing projects, and is plagued with a high crime rate, high unemployment, particularly among its youth, high school dropout rate, high rate of adolescent pregnancy, a high infant mortality rate, an epidemic of substance abuse, and HIV/AIDS. Little Haiti consists primarily of legal and illegal Haitian immigrants, and Hialeah consists primarily of blue-collar and working class Cuban Americans, and illegal and legal Nicaraguan

immigrants.  The diversity of the service area and its populations, coupled with the health care problems directly related to its social ills, has represented a formidable challenge to the delivery of quality primary health care services.  It is against this dynamic backdrop that the Family Health Center, Inc. has existed and operated for over 25 years.

The EOFHC is currently the major primary health care provider for a segment of Dade County, with a population totalling over 300,000, and is one of only two community health centers in the State of Florida  accredited by the Accreditation Association of Ambulatory Health Care, Inc.

While the milieu in which we exist continues to reflect the vast socio-political shifts that characterizes South Florida in general, we are pleased with our major achievements and their impact on the health care status of our service population.  In 1988, EOFHC opened a Residential Treatment Center for pregnant substance abusers and a satellite center.  A Perinatal Case Management team approach was instituted for the most effective provision of perinatal care: a Risk Management Process was also initiated to monitor and maintain ultimate safety in the clinical environment.  In the service area, we have initiated an aggressive AIDS Outreach and Education Program.  Additionally, pre-test counselling, testing, and post test counselling as well as diagnosis and treatment are provided.

The inclusion of case management and day/nite treatment for substance abusers has dramatically increased the quality and quantity of services.  More women are returning for post-natal and family planning services; and as a result, a decrease in repeat pregnancies is expected.  HIV positive patients have increased their follow through with physicians' orders and more patients are referred and entering substance abuse treatment.

The health services provided by this Center directly impact the lives of a large segment of the community.  If it were not in operation, its user population would suffer dramatically.  An already embarrassing and humiliating infant mortality rate would worsen; more adults and elderly would unnecessarily become handicapped and die from diabetes, cancer, hypertension, and heart attacks.  Out-breaks of preventable communicable diseases including sexually transmitted diseases would occur more frequently and spread rapidly.  More substance abusing addicts would deliver more addicted infants, to name a few.

The Center's impact on the population is best understood by comparing the health status of the user population to that of the population in general.  Further illustration is the fact that within the past year not one prenatal patient has delivered an addicted infant.  This occurred in an area that contributes as many as 10 addicted newborns a day.

Although EOFHC is located within an area of rampant illegal drugs, violence and crime and it is shunned by those residing in other areas, services are provided in a safe environment.  In

fact, the attention given to the safety of patients and staff correlates highly with the increase in patient and staff stability.  Some physicians have been employed for more than 15 years.

ADDICTIONS AND PREVENTIVE HEALTH SERVICES

A comprehensive system of services ranging from one of the least restrictive Units, prevention/education, to our most restrictive service, long-term residential care for women and their children is available.

Each patient receives an individualized treatment plan with emphasis on education and vocational achievement.  Relapse prevention begins once the patient is enrolled and aftercare is provided to each patient for a minimum period of one (1) year.

The following is a brief description of each component of Addictions and Preventive Health Services:

ALPHA  -  (A Learning Place for High Achievement)

ALPHA is a drug abuse prevention program which provides early intervention services in two (2) inner city elementary schools for students in grades 3 to 6.  This Program serves 120 students annually.

Outpatient Services

Provides intensive therapeutic activities to patients enrolled. patients are involved in Alcoholic Anonymous/Narcotic Anonymous support groups, educational groups, family planning, parenting skills training, relapse prevention and aftercare services. Length of stay is six (6) months.  Referrals are received from health professionals, self, family, criminal justice, and other social service agencies.  This Program serves approximately 300 clients annually.

Women's Residential Program

The Women's Residential Program is designed to serve chemically dependent women between 18-35 years old and their children.  The range of stay is nine to twelve months.  Patients are required to participate in a remedial and General Equivalent Diploma (GED) Program.  Women may bring two children (0-5 years) to live with them while in treatment.   Vocational counseling and placement is provided.

Men's Residential Program

The Men's Residential Program provides a structured therapeutic environment that pro-actively addresses the dynamics of substance abuse/addiction and withdrawal.  The men are encouraged to focus on the development of skills necessary to meet personal and societal needs in a healthy and productive manner.  The Program

provides services for up to 30 clients and operates 24 hours, seven days per week.  Treatment is provided through five progressive phases: Orientation, Freshman, Sophomore, Transition and Aftercare.  Clients graduate from the Program when they have met the same criteria as the Women.

Successful program completion requires:

o Gainful employment for minimum of ninety (90) days.
o A minimum of $500 in savings.
o An approved place to live.
o A GED or high school diploma.

Day Care Program

The Agency operates a Day-Care Program for the children of the mothers in the Women's Residential Program, as well as children of the community.  The Day-Care Program provides peace of mind for the mothers and allows them to concentrate on treatment and recovery.  The Program currently operates at capacity and has 125 children enrolled.  The hours of operation are 7:00 a.m.-7:00 p.m., Monday through Friday.

Day/Night Treatment Program

This the Agency's newest addition.  This Program affords extended care to clients needing treatment 5 days per week, 4 hours a day. The length of stay is 6 months.  Participation in a remedial program and completion of a General Equivalent Diploma (GED) Program is required.  Gainful employment is expected upon completion.

Referrals are received from physicians, family, Department of Health and Rehabilitative Services, Children's Protective Services Unit, Criminal Justice, and other social service agencies.  Child care services are also provided.  This Program will serve 150 patients annually.

AfterCare Program

The Aftercare Program serves as a link between initial treatment and the transition back into the community.  Aftercare serves as a support mechanism as clients become productive citizens.  A client stays a maximum of one year.

SCHOOL HEALTH INTERVENTION PROGRAM

In the area served by Family Health Center, many children come from families with emotional, physical, or substance abuse problems.  Armed with the knowledge that these children have a higher number of medical problems, are less likely to have a regular source of health care, and their parents are less likely to recognize and use the facilities available to them, the decision was made to take the services to the children.  Since School-based health programs usually target adolescent populations, and there has been little work done in elementary

schools, the program targeted four schools located in the Center's service area during the first year, and increased to eight during the second year.

The objectives of this program are:

To provide a health care team, including a board eligible/certified pediatrician, to screen children who are not under the care of a private physician.

To identify and refer those with health problems which require additional medical, specialty, or social service follow-up.

To promote health education within this screening process for children, parents and teachers, in an effort to reduce absenteeism resulting from health problems and thus enhance the child's learning capacity in the classroom.

To provide strong dedicated health care professionals as role models for future development of the children.

The Program was developed with input and assistance from the principals and other administrative personnel.  The following services are provided on a weekly basis:

> o  Physical Examination, Diagnosis and Treatment
> o  Sickle Cell Anemia Testing
> o  Hemoglobin Testing
> o  Health Education
> o  Referrals
> o  Outreach/Follow-up

Within the first six months, 523 children were screened for health problems by a board certified pediatrician.  Two hundred forty (240) or 45.8% had a total of 284 health problems.

One hundred ninety-seven (197) or 68% were medical problems, and 92 or 32% were dental problems.

Forty-one (41) of the children received urgent attention by the pediatrician or a specialty service.

As a result of this ongoing intervention, the number of illnesses have decreased, and significant absences have been prevented.

A:fhc:mission

## HIV/AIDS SERVICES

*The Department of Special Populations provides HIV/AIDS services under the leadership of Sr. Vice President.*

### GOALS

*To reduce the spread of HIV infection through information, education and screening.*

*To improve the quality of life for people living with HIV/AIDS by providing quality health and support services.*

### OBJECTIVES

*To provide quality comprehensive HIV/AIDS and related services to 633 clients during the contract period 1996-97.*

*To conduct a minimum of (8) eight education sessions and (300) three hundred outreach contacts to high/increased risk individuals on the street or in community settings each month during the contract period 1996-97.*

### STAFFING *(26.5 Staff Members)*

* *(1) Administration*
* *(3) Supervisors/Managers*
* *(20.5) Direct Service Providers (Counselors, Case Managers, Psychologist, etc.)*
* *(2) Clerical*

### FUNDING *(Over one million dollars annually)*

*HIV/AIDS services are funded by:*
> **Care and Treatment**
>> * *Ryan White Title I*
>>> *(Metro Dade County)*
>> * *Ryan White Title IIIb*
>>> *(Health Resources and Services Administration (HRSA))*
>> * *South Florida AIDS Network (SFAN)*
>>> *(The State of Florida General Revenue)*

> **HIV Prevention**
>> * *Minority AIDS Prevention initiative (MAPI)*
>>> *(Florida State Department of Health)*

## HIV/AIDS SERVICES OFFERED

### VOLUNTARY CONFIDENTIAL COUNSELING TESTING
* Pretest Counseling
* Testing with Informed Consent
* Post-Test Counseling and Follow up

### CASE MANAGEMENT
* Patient Advocacy and Enpowerment
* Assessment
* Care Planning, Monitoring and Evaluation
* Service Arrangement and Linkage
* Resources Identification and Referral
* Patient Education

### HIV PREVENTION EDUCATION AND OUTREACH
* Education Sessions
* Street Outreach
* Prevention Case Management  (Directed toward persons who need individualized
    support to remain seronegative or other support to reduce the risk of HIV
    transmission to others.)
* Distribution of literature and condoms with instructions.
* Provide information on the availability and accessibility of services.
* Referrals

### PSYCHOSOCIAL
* Individual Counseling
* Group Counseling
* Family Counseling
* Support Groups

### VOUCHERABLE SERVICES
* Food Vouchers
* Direct Financial Assistance-personal hygiene voucher, utilities(gas, water,electrical,phone)
* Transportation (bus passes and tokens)

### HOUSING
* Low Income Permanent Housing (Sugarhill/24 units)
* Long Term Rental Assistance
* Utility Assistance

### OTHER HEALTH/ SUPPORT SERVICES
* Primary Care
* Dental
* Outpatient Speciality Care
* Day care
* Nutritional Supplement (Sustacal)



ECONOMIC OPPORTUNITY
# *FAMILY HEALTH CENTER, INC.*
**5361 N.W. 22nd AVENUE, MIAMI, FL 33142   TELEPHONE(305) 637-6400**

## OVERVIEW OF TRICE CENTER FOR LEARNING AND HEALTH
### (Day Care)

Economic Opportunity Family Health Center, Inc. is a private, non-profit Primary Health Care Agency, which has been providing services in the community since 1967. Operating from ten service sites, it is the largest Primary Care Agency in the South, and one of the Largest in the United States.

Its primary mission has always been the provision of high quality, comprehensive health care to the poor, and medically underserved individuals and families who live in the immediate communities surrounding the Agency and its satellites in Dade County, Florida.

The Agency's child care center, Trice Center For Learning and Health, located at 901 N.W. 54th Street, was opened in 1990 as an extension of it's comprehensive services.

The service area of the Trice Center for Learning and Health, comprises the areas known locally as Liberty City, Brownsville and portions of Little Haiti. Additionally, children also come from the Hialeah area, which is predominantly Hispanic. More than 50% of the residents in this service area reside at, or below the poverty level. There are seven low-income public housing projects in this service area.

This area is know as an economically deprived and educationally underserved area. The following groups of ethnic minorities make up the residents: African-Americans, Hispanics and Haitians, most of whom represent the poor and working poor.

The area is also plagued with high rates of crime, HIV/AIDS, unemployment, adolescent pregnancy, infant mortalities and an epidemic of substance abuse.

In addition to providing high quality childcare services for the general public, Trice Center also provides extended childcare for children whose parents are active clients in EOFHC's Comprehensive Drug Addictions Treatment Program. The Center is licensed to serve 125 children, and the hours of operation are from 7:00a.m. to 7:00p.m., Monday through Friday. Presently 40% of our children are infants/toddlers, 58% are preschoolers, and 2% are in the after school program. Among the families using Trice Center, 20% are in the Addictions Program, 50% are on subsidized childcare, 20% are at the lowest rate of our sliding fee scale, and 10% are private. 80% of the children we serve are from female-headed, single parent homes.

The Center provides comprehensive, developmentally-specific, educational activities, and quality primary care to young children ages 0-5, years and after-school care up to 12 years of age. The main focus is to provide early intervention through high quality child care, and education for children who are at-risk for developmental delay and future academic failure.



ECONOMIC OPPORTUNITY
# *FAMILY HEALTH CENTER, INC.*
5361 N.W. 22nd AVENUE, MIAMI, FL 33142   TELEPHONE(305) 637-6400

HEALTH EDUCATION AND
STAFF DEVELOPMENT PROGRAM

Jacquelyn Davis, R.N.
Sr. Vice President/Chief Operating Officer

I.   PHILOSOPHY AND GOALS

The philosophy of the health education department is that the best health care is preventive; and has therefore set as its goals:

1.   The improvement of the quality of life through knowledge and performance.

2.   To raise the health consciousness of individuals and the total community through education which focuses on health promotion and disease prevention.

3.   To change the "crisis-oriented" mentality toward health care and promote early detection and treatment.

4.   To provide sufficient information to allow the public to make educated decisions regarding health.

5.   To provide a media for a free exchange of information to enhance comprehension.

6.   To reduce the incidence of "preventable" diseases through education.

II.  PROGRAM COMPONENTS:

    I.   Patient Education

        A.   Development and implementation of comprehensive internal and external education program.

            1.   Assessing education needs
            2.   Developing curricula
            3.   Scheduling classes
            4.   Evaluating programs

    B.      Staff supervision

            Health Educators
            Patient Relations Coordinator
            Administrative Secretary

    C.      Community Outreach Programs

          1.      Seminars
          2.      Health Fair, etc.

II.    <u>Staff Development</u>

    A.      Identifying educational needs of staff
    B.      Planning inservices
    C.      Customer Relations Program
    D.      Improving staff morale

III.    <u>Patient Relations</u>

    A.      Monitoring patient satisfaction
    B.      Identifying problems and initiating corrective actions
    C.      Improving patient relations

# ADDICTIONS INTAKE

AGENCY:     Economic Opportunity Family Health Center, Inc.
            Department of Addictions & Preventive Health Services

LOCATION:  5361 N. W. 22nd Avenue
           Miami, Florida  33142

TELEPHONE: 305/637-6483

OPERATION: Monday & Thursday          - 8 a.m. - 8 p.m.
           Tuesday, Wednesday, Friday  - 8 a.m. - 5 p.m.

MANAGER:   Elizabeth Davis, BSN


Intake is an important process in your treatment planning.  In this department you will be privy to meeting a professional staff who is interested in your well being and success.

A thorough assessment will be provided by our intake specialist(s) who is trained to determine the treatment modality best suited for you.

The modalities of treatments offered at Family Health Center Addictions Department are:

- ◆ Outpatient
- ◆ Day/Nite
- ◆ Residential

* An Information sheet will be provided on the modality of treatment provided.

Formal graduation with certificate of completion will be provided at the end of a successful completion of the assigned treatment modality.

## Intake Admission Procedures and Criteria

- ◆ Diagnostic Assessment to determine the appropriate treatment modality
- ◆ Physical Examination
- ◆ Health Screening for Infants and Children
- ◆ Tuberculosis Testing
- ◆ Psychiatric/Psychological Assessment (If appropriate)
- ◆ Referral to Case Management
- ◆ HIV Pre and Post Test Counseling
*Pregnant women and children receive priority for available bed space.

# DAY/NITE TREATMENT PROGRAM

AGENCY:           Economic Opportunity Family Health Center, Inc.
                  Department of Addictions & Preventive Health Services

LOCATION:         490 East Hialeah Drive, 4th Floor
                  Hialeah, Florida  33010

TELEPHONE:        305/889-5713

OPERATION:        Monday - Friday:  8 a.m. - 10 p.m.

MANAGER:          Eric Jones

The Economic Opportunity Family Health Center's Day/Nite Treatment Program was
formally established in February, 1990.  It was designed to provide intensive structured
treatment for a minimum of four (4) hours a day five (5) days a week.

Day/Nite Treatment Program is a unique, innovative approach to providing intensive
Outpatient Services to those who are addicted to alcohol and drugs.

**Services Offered:**

- Individualized Treatment Planning, Intensive Individual,
  Group, and Family Counseling
- Vocational and Educational Environment
- Linkage to Primary Health Care Services
- Discharge Planning and Linkage to After Care
- Case Management
- Socialization Skill Development

**Admission Criteria:**

- Must be 18 years or older

**NOTE:  FOR ADMISSION INFORMATION, PLEASE CALL 305/637-6483**

# JEFFERSON REAVES HOUSE

The Jefferson Reaves House Residential Program is geared to service adult women.  Its major objective is to change the chemically dependent person's life to ensure participation in the community as a fully productive and responsible member of society.

The Program provides a drug free environment, and is supervised by a fully qualified staff, who serve as role models and direct the work of the residents, while offering a holistic approach to treatment.  The Program is devised to reinforce appropriate behaviors.  Program content includes, Individual and Group Counseling, Health Education, and Parenting Classes, Aerobics and Creative Arts.

Reaves House provides a therapeutic environment, with a capacity of 40 full-time clients and their children under five years old.  It is structured in five progressive phases - orientation, freshman, sophomore, transitional and aftercare.

Jefferson Reaves House is a component of Economic Opportunity Family Health Center's Addictions and Preventive Health Services and is located at 2985 N. W. 54th Street, Miami, Florida  33142.

**FOR ADMISSION CONTACT:  INTAKE SECTION: 637-6483**

# MEN'S RESIDENTIAL

## Program Structure & Environment

The Economic Opportunity Family Health Center's Men's Residential Program is located in a serene suburban section of North Miami. The treatment complex consists of two (2) spacious homes which provide ample space for our clients to maximize rehabilitation efforts in the comfort of semi-private rooms. The facility is unique for its home-like environment. This therapeutic community features culturally relevant group therapy. To add a dimension of safety to this serene setting, a security guard patrols the grounds on a 24 hour basis. The intent of the program is to provide the resident with quality substance abuse treatment in a safe and secure environment.

## Treatment Services

- ◆ Individual Counseling
- ◆ Group Counseling
- ◆ Educational Development
- ◆ Medical/Dental Services
- ◆ Psychiatric/Psychological Services
- ◆ Vocational Assistance
- ◆ Relapse Prevention
- ◆ Aftercare
- ◆ Short-term Treatment
- ◆ Long-term Treatment

## Phases of Treatment

- ◆ Orientation
- ◆ Residential
- ◆ Re-entry
- ◆ Aftercare

## Duration

- ◆ 30 to 180 Days

**FOR FURTHER INFORMATION, PLEASE CONTACT INTAKE AT 305/637-6483**

## OUTPATIENT TREATMENT PROGRAM

**AGENCY:**  **Economic Opportunity Family Health Center, Inc.**
**Department of Addictions & Preventive Health Services**

**LOCATION:**  149 West Plaza, Suite 236
(Northside Shopping Center)
Miami, Florida  33147

**TELEPHONE:**  305/693-7944

**OPERATION:**  Monday - Thursday:  8 a.m. - 8 p.m.
Friday:            8 a.m. - 5 p.m.
Saturday:          8 a.m. - 5 p.m.

**MANAGER:**  Assan Njie

The Economic Opportunity Family Health Center's **Outpatient Treatment Program** was formally established in 1970 under the name of **UHURU** then 1975 **New Beginning Care Unit** and 1978 **Addictions & Preventive Health Services.**

**Outpatient Treatment Program** is unique, innovative approach to providing Outpatient Services to those who are addicted to alcohol and drugs.

**Services Offered:**

- ◆ Individual, Group and Family Counseling
- ◆ Linkage to Primary Health Care Services
- ◆ Discharge Planning
- ◆ Case Management

**Admission Criteria:**

- ◆ Must be 18 years or older
- ◆ Must be cleared medically by medical staff
- ◆ Clients primary diagnosis must be substance abuse
- ◆ Psychiatric and Psychology Evaluations Available

**FEE:**  **Sliding Scale**
Covered by:  Medicaid, Medicare, Third Party Insurance, Self-Pay

**NOTE:  FOR ADMISSION INFORMATION, PLEASE CALL 305/637-6483**



Organizational Chart

Board of Directors

Jessie Trice
President & CEO

**Fatima Zafar, MD**
Sr. VP & Chief
Exe. Medical
Officer/Clinical
Health Services

**Willie Brown**
Sr. Vice President
& Chief of ARHS &
Administrative
Support Services

**Clarence Lawrence**
Sr. Vice President
& Chief Financial
Officer

**Jacquelyn Davis**
Sr. Vice President
& Chief Operating
Officer

**Frankie Swain**
Sr. Vice President
& Chief of Special
Populations

**Ruth Duval**
Sr. Vice President
& Chief Risk
Management Officer

Medical Services
• Physicians
• Dentists
• ARNPS
• PAs
• Psychiatrist
• Psychologist

Hospital & Specialty
Services
• Inpatient
• Specialists
• Hospital Relations

School Health Services
• FMC
• COPE
• ALPHA
• Elementary/Jr./
  School Services
• Head Start
• Day Care

Other Services
• Research
• QA
• Vision
• Medical Records
• Nutrition

Human Resources
Health Education
Patient Relations
Registration
Appointments
Cl. Support Staff

Pharmacy
Laboratory
Radiology

Managed Care

Contract Billing
Patient Billing
& Collections

Accts. Payable
Payroll
Acct/Auditing

Cashiering
PBX

Corrections
EAP

Facilities
Operations
Purchasing
Communications

MIS
Fundraising



DEPARTMENT OF SPECIAL POPULATIONS
ORGANIZATIONAL CHART

President & CEO

Sr. Vice President & Chief
Special Populations

Administrative
Assistant

Coordinator

HIV Prevention & Education
Community Education

Education Specialist
Peer Counselors

Manager

HIV Counseling &
Testing

Patient Care Liaison
Counselors

Psychosocial Services

Psychologist
Counselors

Manager

Case Management Services

Case Managers
Unit Clerk
Senior Aide

# P. EXHIBIT 14



ECONOMIC OPPORTUNITY FAMILY HEALTH CENTER, INC.
ORGANIZATIONAL CHART





DEPARTMENT OF SPECIAL POPULATIONS
ORGANIZATIONAL CHART

President & CEO

Sr. Vice President & Chief
Special Populations

Administrative
Assistant

Manager

Case Management Services

Case Managers
Unit Clerk
Senior Aide

Manager

Psychosocial Services

Psychologist
Counselors

HIV Counseling &
Testing

Patient Care Liaison
Counselors

Coordinator

HIV Prevention & Education
Community Education

Education Specialist
Peer Counselors

P EXHIBIT 15

9

## HIV/AIDS SERVICES

*The Department of Special Populations provides HIV/AIDS services under the leadership of Sr. Vice President.*

### GOALS

*To reduce the spread of HIV infection through information, education and screening.*

*To improve the quality of life for people living with HIV/AIDS by providing quality health and support services.*

### OBJECTIVES

*To provide quality comprehensive HIV/AIDS and related services to 633 clients during the contract period 1996-97.*

*To conduct a minimum of (8) eight education sessions and (300) three hundred outreach contacts to high/increased risk individuals on the street or in community settings each month during the contract period 1996-97.*

### STAFFING *(26.5 Staff Members)*

* *(1) Administration*
* *(3) Supervisors/Managers*
* *(20.5) Direct Service Providers (Counselors, Case Managers, Psychologist, etc.)*
* *(2) Clerical*

### FUNDING *(Over one million dollars annually)*

*HIV/AIDS services are funded by:*
> **Care and Treatment**
>> * *Ryan White Title I*
>>   *(Metro Dade County)*
>> * *Ryan White Title IIIb*
>>   *(Health Resources and Services Administration (HRSA))*
>> * *South Florida AIDS Network (SFAN)*
>>   *(The State of Florida General Revenue)*

> **HIV Prevention**
>> * *Minority AIDS Prevention initiative (MAPI)*
>>   *(Florida State Department of Health)*

# ORGANIZATIONAL CHART

## FOR

## THE M.A.P.I. PROGRAM

### "THE L.O.V.E. PROJECT"



PROJECT DIRECTOR
(Supervisor)
Dr. Willie Brown, PH.D.

PROGRAM COORDINATOR
(Supervisor)
Lorna Beach-Allen, B.A.

Educational Specialist
Shelor Gray

Outreach Worker
Joyce Green

VOLUNTEER
(vacant)

VOLUNTEER
~~Cheryl Sims~~

VOLUNTEER
Deleez Oquendo

VOLUNTEER
Glenda Torres

# P. EXHIBIT 16

07/30/2002  10:02    3056238997

FROM : MICHAEL WILENSKY M.D.            PHONE NO. : 305 948 9781        Oct. 11 1996 04:04PM P1

DIPLOMATE, AMERICAN BOARD OF                                    FELLOW, AMERICAN ACADEMY OF
      ORTHOPAEDIC SURGERY                                            ORTHOPAEDIC SURGEONS

### MICHAEL H. WILENSKY, M. D., P. A.
ORTHOPAEDIC SURGERY
ARTHROSCOPIC SURGERY OF THE KNEE

SUITE 104
16401 NORTHWEST 2ND AVE                                         TELEPHONE
NORTH MIAMI BEACH, FLORIDA 33169                                (305) 948-8829

---

### Lorna Beach-Allen

9/20/96

The patient's MRI of the lumbar spine on 9/12/96 at the MRI
Institute of N.M.B. read by Dr. Steinberg showed an L4-5 small
central herniated disc protrusion. MRI of the cervical spine on
9/12/96 showed straightening of the cervical spine, hypertrophy of
the facets on the right at C5-6 with mild right foraminal
encroachment. The patient is continuing therapy modalities with Dr.
Rosen and Osborne. She is finishing up. Computerized muscle testing
of the lumbar spine on 8/27/96 showed decreased strength in lateral
flexion of 12.6%. Computerized muscle testing of the cervical spine
showed decreased rotation of 47% and lateral flexion of 11%.
Computerized muscle testing of the right hip showed decreased
strength in flexion of 58%, external rotation 42%, abduction 33%
and extension 18%. At this point she continues Advil 3 x a day, or
the Norgesic Forte, which she has. I have renewed the Darvocet N100
for pain, total of 45 tablets.
At this point the patient has plateaued off from the motor vehicle
accident on 4/4/96. Due to her disc in her back and her chronic
cervical and lumbar myofascitis and radiculitis, decreased strength
in her neck, back and right hip area, she will be left with a 7-10%
permanent residual disability to the body as a whole.

MHW/jfl

# P. EXHIBIT 17



### ·ECONOMIC OPPORTUNITY
# *FAMILY HEALTH CENTER, INC.*
5361 N.W. 22nd AVENUE, MIAMI, FL 33142   TELEPHONE(305) 637-6400

LEAVE REQUEST

| EMPLOYEE'S NAME | | DEPARTMENT | DATE PREPARED |
|---|---|---|---|
| (LAST) BEACH-ALLEN | (FIRST) LORNA | SPEC. POP. | 5/2/97 |

| BEGIN LEAVE | END LEAVE | RETURN DATE | NO. OF PAID DAYS | NO. OF UNPAID DAYS |
|---|---|---|---|---|
| 4/28/77 | 4/28/97 | 4/29/97 | 1 | |

| CHARGE ABSENCE TO: SICK LEAVE | REASON FOR ABSENCE - REMARKS |
|---|---|

| No. of Days | Type of Leave | |
|---|---|---|
| | Vacation | |
| 1 | Sick Leave | SEVERE BACK / STOMACH PAINS (SINUSIS) |
| | Compensatory Time | |
| | Administrative Leave | |
| | Floating Holiday | |
| | Injury With Pay | |
| | Military Leave | |
| | Jury Duty | |
| | Educational Leave | |
| | Sick Without Pay | |
| | Funeral Leave | |
| | Other | |

| VACATION PAY IN ADVANCE YES___ NO ___ | EMPLOYEE'S SIGNATURE | DEPT. APPROVAL |
|---|---|---|
| SUBMIT 3 WEEKS IN ADVANCE | L. Beach-Allen | |
| | SUPERVISOR'S APPROVAL      (PAYROLL USE) | |
| | Frankie Swan | |

# P. EXHIBIT 18



ECONOMIC OPPORTUNITY
*FAMILY HEALTH CENTER, INC.*
5361 N.W. 22nd AVENUE, MIAMI, FL 33142   TELEPHONE(305) 637-6400

LEAVE REQUEST

| EMPLOYEE'S NAME | | DEPARTMENT | DATE PREPARED |
|---|---|---|---|
| (LAST) | (FIRST) | | |
| BEACH-ALLEN | LORNA | SPEC. POPS | 6/27/9- |

| BEGIN LEAVE | END LEAVE | RETURN DATE | NO. OF PAID DAYS | NO. OF UNPAID DAY |
|---|---|---|---|---|
| 6/16/97 | 6/17/97 | 6/18/97 | 2 | |

| CHARGE ABSENCE TO: | | REASON FOR ABSENCE - REMARKS |
|---|---|---|

| No. of Days | Type of Leave | |
|---|---|---|
| | Vacation | |
| 2 | Sick Leave | MUSCLE SPASMS   SPINAL MALADJUSTME |
| | Compensatory Time | |
| | Administrative Leave | |
| | Floating Holiday | |
| | Injury With Pay | |
| | Military Leave | |
| | Jury Duty | |
| | Educational Leave | |
| | Sick Without Pay | |
| | Funeral Leave | |
| | Other | |

| VACATION PAY IN ADVANCE YES___ NO___ | EMPLOYEE'S SIGNATURE | DEPT. APPROVAL |
|---|---|---|
| SUBMIT 3 WEEKS IN ADVANCE | *Lorna Beach-Allen* | |
| | SUPERVISOR'S APPROVAL | PAYROLL US |

# P. EXHIBIT 19



# ECONOMIC OPPORTUNITY
## FAMILY HEALTH CENTER, INC.
### 490 E. HIALEAH DRIVE, MIAMI, FL. 33010
### TELEPHONE (305) 889-5721

### LEAVE REQUEST

EMPLOYEE'S NAME: _BEACH - ALLEN_    _LORNA_
                 (LAST)              (FIRST)

DEPARTMENT: _M.A.P.I. PROGRAM_ DATE PREPARED: _9/22/97_

LEAVE BEGIN: _9/9/97_          END: _9/12/97_

RETURN DATE: _9/15/97_

NUMBER OF PAID DAYS: _4_   NUMBER OF UNPAID DAYS: _____

CHARGE ABSENCE TO: _SICK LEAVE_

| REASON FOR ABSENCE | NUMBER OF DAYS | REMARKS |
|---|---|---|
| Vacation | | |
| Sick Leave | 4 | SEVERE BACK PAIN (HERNIATED DISK MAYBE SURGERY) |
| Compensatory Time | | |
| Administrative Leave | | |
| Floating Holiday | | |
| Injury With Pay | | |
| Military Leave | | |
| Jury Duty | | |
| Educational Leave | | |
| Sick Without Pay | | |
| Funeral Leave | | |
| Other | | |

VACATION PAY IN ADVANCE:     YES ___   NO ___
(SUBMIT 3 WEEKS IN ADVANCE)

EMPLOYEE'S SIGNATURE: _Lorna Beach Allen_

DEPT. APPROVAL: _OUT SICK (MS. SWAIN)_

SUPERVISOR'S APPROVAL: _OUT SICK (MS. SWAIN)_ (PAYROLL USE)

# P. EXHIBIT 20



# ECONOMIC OPPORTUNITY
# FAMILY HEALTH CENTER, INC.

5361 N.W. 22nd AVENUE, MIAMI, FL 33142   TELEPHONE(305) 637-6400

LEAVE REQUEST

| EMPLOYEE'S NAME | | | DEPARTMENT | DATE PREPARED |
|---|---|---|---|---|
| (LAST) BEACH-ALLEN | | (FIRST) LORNA | SPEC. POPULATIONS | 1/28/98 |

| BEGIN LEAVE | END LEAVE | RETURN DATE | NO. OF PAID DAYS | NO. OF UNPAID DAYS |
|---|---|---|---|---|
| 1/26/98 | 1/27/98 | 1/28/98 | 2 | — |

| CHARGE ABSENCE TO: | | REASON FOR ABSENCE - REMARKS |
|---|---|---|

| No. of Days | Type of Leave | |
|---|---|---|
| | Vacation | |
| 2 | Sick Leave | STOMACH VIRUS - NAUSEA, VOMITING, DIARRHEA |
| | Compensatory Time | |
| | Administrative Leave | |
| | Floating Holiday | |
| | Injury With Pay | |
| | Military Leave | |
| | Jury Duty | |
| | Educational Leave | |
| | Sick Without Pay | |
| | Funeral Leave | |
| | Other | |

| VACATION PAY IN ADVANCE YES___ NO ___ SUBMIT 2 WEEKS IN ADVANCE | EMPLOYEE'S SIGNATURE Lorna Beach-Allen | DEPT. APPROVAL |
|---|---|---|
| | SUPERVISOR'S APPROVAL Willie L. Brown | (PAYROLL USE) |

# P. EXHIBIT 21



# ECONOMIC OPPORTUNITY
## *FAMILY HEALTH CENTER, INC.*
490 E. HIALEAH DRIVE, MIAMI, FL. 33010
TELEPHONE (305) 889-5721

LEAVE REQUEST

EMPLOYEE'S NAME: _Green_ _Joyce_
(LAST)                    (FIRST)

DEPARTMENT: _Spec Pop._            DATE PREPARED: _3/11/98_

LEAVE BEGIN: _3/12/98_        END: _3/16/98_

RETURN DATE: _3/17/98_

NUMBER OF PAID DAYS: _3_      NUMBER OF UNPAID DAYS: _0_

CHARGE ABSENCE TO: _Funeral Leave_

| REASON FOR ABSENCE | NUMBER OF DAYS | REMARKS |
|---|---|---|
| Vacation | | |
| Sick Leave | | |
| Compensatory Time | | |
| Administrative Leave | | |
| Floating Holiday | | |
| Injury With Pay | | |
| Military Leave | | |
| Jury Duty | | |
| Educational Leave | | |
| Sick Without Pay | | |
| Funeral Leave | 3 | Sister Passed Away |
| Other | | |

VACATION PAY IN ADVANCE:          YES ___   NO ___
(SUBMIT 3 WEEKS IN ADVANCE)

EMPLOYEE'S SIGNATURE: _Joyce Green_

DEPT. APPROVAL: _____

SUPERVISOR'S APPROVAL: _Lorna Head-Ali___     (PAYROLL USE)

# P. EXHIBIT 22



P. EXHIBIT 23

 **CANADA LIFE**

U.S. Group
P.O. Box 105025
Atlanta, GA 30348-5025

(800) 554-4026

January 18, 1999

Lorna Beach-Allen
18800 NW 2nd Ave.
Miami, FL  33169

RE:     Short Term Disability
        Group: 86118
        Division: 0
        Certificate: 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

Dear Ms. Beach-Allen,

We have reviewed your faxed continuing disability claim form dated January 5, 1999.

Please review the following policy definition:

> "Disabled" and "disability" mean the inability of the person, due to injury, disease,
> pregnancy or mental disorder, to work for wages or profit.

Benefits have been paid through September 7, 1998.  Medical records submitted by Dr. Evan A
Rosen on September 8, 1998 indicate that you were able to return to work on September 8, 1998.
Dr. Rosen did state that you were advised not to sit for prolonged periods of time while at work.  At
this time we do not have any objective clinical findings to support total disability as defined above.
Therefore, we are denying further liability on your claim and no further benefits will be issued.

According to the Employee Retirement Income Security Act (ERISA) you have the right to appeal
our decision to decline benefit payments.  Any appeal must be submitted in writing within 60 days
of receipt of this letter.  Please forward any such appeal to my attention along with medical
documentation to include office notes, lab/diagnostic test results, and any other information you
feel supports total disability beyond September 7, 1998.

Sincerely,

Shannon McCain
Short-Term Disability Examiner

cc:     Economic Opportunity Family Health Center

# P. EXHIBIT 24

The Canada Life Assurance Company

**CANADA LIFE**

Mail completed form(s) to The Canada Life Assurance Company at this address:

U.S. Group Short Term Disability Claims Dept.
P.O. Box 105025
Atlanta, GA 30348-5025
Phone Inquiries: 1-800-554-4026
Fax No.    : 1-770-612-1564

## CONTINUANCE OF SHORT TERM DISABILITY CLAIM ATTENDING PHYSICIAN'S STATEMENT
### Failure to complete group policy number may delay claim payment

**PATIENT INFORMATION - This portion to be completed by Patient**

**Group Policy Number**
86118

| Patient Name | Date of Birth | Social Security Number | Telephone Number |
|---|---|---|---|
| LORNA BEACH-ALLEN | 2/23/56 | 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 | (305) 655-3233 |

| Street Address | City | State | Zip |
|---|---|---|---|
| 18800 NW 2ND AVE. #223 | MIAMI | FL | 33169 |

I hereby authorize the release to my Insurer and my policyholder of any information in respect to this claim.

Patient's Signature    *Lorna Beach-Allen*

**Date** 5/15/98

**ATTENDING PHYSICIAN'S STATEMENT - Continuance of Disability Claim**

1. **DIAGNOSIS**
   (a) Diagnosis (including any complications)   HERNIATED C4-L5 INTERVERTEBRAL DISC
   (b) Secondary diagnosis   CHRONIC CERVICAL SPRAIN/STRAIN
   (c) Subjective diagnosis

   (d) Objective findings (include current x-rays, EKG's, laboratory data, and any clinical findings)
   MUSCLE SPASM, RESTRICTED RANGE OF MOTION

2. **DATES OF TREATMENT**
   (a) Date of first visit  Mo. 4  Day 5  Yr. 96   Date of last visit  Mo. 5  Day 15  Yr. 98
   Date of next visit  Mo. 5  Day 19  Yr. 98
   (b) Frequency   ☐ Weekly   ☐ Monthly   ☒ Other (specify)  AS NEEDED

3. **NATURE OF TREATMENT** (including surgery and medications prescribed, if any)
   SPINAL MANIPULATION, ELECTRICAL MUSCLE STIMULATION, MOIST HOT PACKS

4. **PROGRESS**
   (d) Has patient   ☐ Recovered?   ☒ Improved? MINIMALLY   ☐ Unchanged?   ☐ Retrogressed?
   (e) Is patient   ☒ Ambulatory?   ☐ House confined?   ☐ Bed confined?   ☐ Hospital confined?
   (f) Has patient been hospital confined?   ☐ Yes   ☒ No   If yes, give Name and Address of Hospital:

   Confined from _____ through _____   _____

5. **CARDIAC** (if applicable)  N/A
   (a) Functional capacity (American Heart Association)   ☐ Class 1 (no limitation)   ☐ Class 2 (slight limitation)
   ☐ Class 3 (marked limitation)   ☐ Class 4 (complete limitation)
   (b) Blood Pressure (last visit) _____/_____   Date _____

6. **PHYSICAL IMPAIRMENT** (as defined in Federal Dictionary of Occupational Titles)
   ☐ Class 1 - No limitation of functional capacity; capable of heavy work   No restrictions   ( 0 - 10%)
   ☐ Class 2 - Medium and manual activity   (15 - 30%)
   ☐ Class 3 - Slight limitation of functional capacity; capable of light work   (35 - 55%)
   ☐ Class 4 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity   (60 - 70%)
   ☒ Class 5 - Severe limitation of functional capacity; incapable of minimum (sedentary) activity   (75 - 100%)
   Remarks: _____

# P. EXHIBIT 25

1024 STDAPS 10/97

7. **MENTAL / NERVOUS IMPAIRMENT** (if applicable) *N/A*

   (a)  Please define stress as it applies to this patient.

   (b)  What stress and problems in interpersonal relations has claimant had on job?

     ☐ Class 1 - Patient is able to function under stress and engage in interpersonal relations (no limitations)
     ☐ Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relations (slight limitations)
     ☐ Class 3 - Patient is able to engage in only limited stress situations and limited interpersonal relations (moderate limitations)
     ☐ Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
     ☐ Class 5 - Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)

   Remarks:

8. **PROGNOSIS**

   (a)  Prognosis  *GUARDED*

   (b)  Other factors affecting recovery

   (c)  Do you expect fundamental or marked change in the future?  *NO*

     If yes, when do you expect patient to recover? Date

     If no, please explain why.  *MS. BENCH-ALLEN HAS SUSTAINED A 13% IMPAIRMENT OF THE WHOLE PERSON*

   (d)  When can your patient return to work?  Full-time *UNDETERMINED* Part-time *UNDETERMINED*

   (e)  What restrictions & limitations exist which may prevent the patient from work activities? *UNABLE TO SIT OR STAND FOR MORE THAN A FEW MINUTES AT A TIME*

9. **REHABILITATION**

| | | PATIENT'S JOB | ANY OTHER WORK |
|---|---|---|---|
| (a) | Is patient a suitable candidate for rehabilitation services? | ☑ Yes ☐ No | ☑ Yes ☐ No |
| (b) | Can present job be modified to allow for handling with impairment? | ☐ Yes ☑ No | ☐ Yes ☐ No |
| (c) | When could trial employment commence? | ☐ Full-time _____ Date | ☐ Full-time _____ Date |
| | *UNDETERMINED* | ☐ Part-time _____ Date | ☐ Part-time _____ Date |
| (d) | Would vocational counseling and/or retraining be recommended? | ☑ Yes ☐ No | |

10. **REMARKS**

Name (Attending Physician) PLEASE PRINT  *DR. EVAN A. ROSEN*

Degree/Specialty  *D.C.*

Telephone Number  *305 652-8401*

Fax Number  *305 652-8413*

Street Address  *250 N.W. 183 ST*

City/Town  *MIAMI*

State  *FL*

Zip Code  *33169*

Physician Signature

Date  *5/15/98*

**Warning** - Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime and subjects such person to criminal and civil penalties.



# CANADA LIFE

Mail completed form(s) to: The Canada Life Assurance Company
at this address:

U.S. Group Short Term Disability Claims Dept.
P.O. Box 105025
Atlanta, GA 30348-5025
Phone Inquiries: 1-800-554-4026
Fax No.       : 1-770-612-1564

## CONTINUANCE OF SHORT TERM DISABILITY CLAIM ATTENDING PHYSICIAN'S STATEMENT
### Failure to complete group policy number may delay claim payment

**PATIENT INFORMATION - This portion to be completed by Patient**

| Patient Name | Date of Birth | Social Security Number | Group Policy Number |
|---|---|---|---|
| LORNA BEACH-ALLEN | 2/23/56 | 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 | |

| Street Address | City | State | Telephone Number |
|---|---|---|---|
| 18880 NW 2ND AVE. #223 | MIAMI | FL | (305)(55-3233) |
| | | Zip 33169 | |

I hereby authorize the release to my Insurer and my policyholder of any information in respect to this claim.

Patient's Signature: *Lorna Beach-Allen*     Date: 12/08/98

## ATTENDING PHYSICIAN'S STATEMENT - Continuance of Disability Claim

**1. DIAGNOSIS**
(a) Diagnosis (including any complications) HNP L4-L5
(b) Secondary diagnosis CHRONIC CERVICAL SP/ST
(c) Subjective diagnosis
(d) Objective findings (include current x-rays, EKG's, laboratory data, and any clinical findings)
MUSCLE SPASM, RESTRICTED RANGE OF MOTION

**2. DATES OF TREATMENT**
(a) Date of first visit Mo. 4 Day 5 Yr. 96   Date of last visit Mo. 1 Day 5 Yr. 99
(b) Date of next visit Mo. ___ Day ___ Yr. ___ AS NEEDED
Frequency ☐ Weekly ☐ Monthly ☑ Other (specify) AS NEEDED

**3. NATURE OF TREATMENT** (including surgery and medications prescribed, if any)
SPINAL MANIPULATION HOT PACKS, ELECTRICAL MUSCLE STIMULATION

**4. PROGRESS**
(d) Has patient ☐ Recovered? ☑ Improved? SOMEWHAT
(e) Is patient ☑ Ambulatory? ☐ House confined? ☐ Unchanged? ☐ Bed confined? ☐ Retrogressed? ☐ Hospital confined?
(f) Has patient been hospital confined? ☐ Yes ☑ No   If yes, give Name and Address of Hospital:
Confined from _____ through _____

**5. CARDIAC (if applicable)** N/A
(a) Functional capacity (American Heart Association) ☐ Class 1 (no limitation) ☐ Class 2 (slight limitation) ☐ Class 3 (marked limitation) ☐ Class 4 (complete limitation)
(b) Blood Pressure (last visit) _____ / _____   Date _____

**6. PHYSICAL IMPAIRMENT (as defined in Federal Dictionary of Occupational Titles)**
☐ Class 1 - No limitation of functional capacity; capable of heavy work
☐ Class 2 - Medium and manual activity
☑ Class 3 - Slight limitation of functional capacity; capable of light work
☐ Class 4 - Moderate limitation of functional capacity; capable of clerical/administrative (sedentary) activity
☐ Class 5 - Severe limitation of functional capacity; incapable of minimum (sedentary) activity

No restrictions   ( 0 - 10%)
( 15 - 30%)
(35 - 55%)
(60 - 70%)
(75 - 100%)

Remarks: _____

## P. EXHIBIT 26

1024 STDAPS 10/97

7. MENTAL/NERVOUS IMPAIRMENT (if applicable) N/A

   (a) Please define stress as it applies to this patient.

   (b) What stress and problems in interpersonal relations has claimant had on job?

   ☐ Class 1 - Patient is able to function under stress and engage in interpersonal relations (no limitations)
   ☐ Class 2 - Patient is able to function in most stress situations and engage in most interpersonal relations (slight limitations)
   ☐ Class 3 - Patient is able to engage in only limited stress situations and limited interpersonal relations (moderate limitations)
   ☐ Class 4 - Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)
   ☐ Class 5 - Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)

   Remarks:

---

8. **PROGNOSIS**

   (a) Prognosis _GUARDED_

   (b) Other factors affecting recovery _____

   (c) Do you expect fundamental or marked change in the future? _NO_

   If yes, when do you expect patient to recover? Date _____

   If no, please explain why. _THE PATIENT HAS SUSTAINED A 13% PPI_

   (d) When can your patient return to work?   Full-time _1/11/99_   Part-time _____

   (e) What restrictions & limitations exist which may prevent the patient from work activities? _ALTERNATE SITTING & STANDING_

---

9. **REHABILITATION**

|  | | PATIENT'S JOB | ANY OTHER WORK |
|---|---|---|---|
| (a) | Is patient a suitable candidate for rehabilitation services? | ☑ Yes ☐ No | ☑ Yes ☐ No |
| (b) | Can present job be modified to allow for handling with impairment? | ☐ Yes ☐ No _UNKNOWN_ | ☐ Yes ☐ No |
| (c) | When could trial employment commence? | ☑ Full-time _1/11/99_ Date | ☐ Full-time ___ Date |
|  |  | ☐ Part-time ___ Date | ☐ Part-time ___ Date |
| (d) | Would vocational counseling and/or retraining be recommended? | ☑ Yes ☐ No | |

---

10. **REMARKS**

---

| Name (Attending Physician) PLEASE PRINT | Degree/Specialty |
|---|---|
| DR EVAN A. ROSEN | D.C. |

| Telephone Number | Fax Number |
|---|---|
| 305 652-8401 | 305 652-8413 |

| Street Address | City/Town | State | Zip Code |
|---|---|---|---|
| 250 NW 183rd St. | MIAMI | FL | 33169 |

| Physician Signature | Date |
|---|---|
| Dr Evan Rosen | 1/5/99 |

**Warning** - Any person who knowingly and with intent to defraud any insurance company or other person files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act which is a crime and subjects such person to criminal and civil penalties.

07/30/2002  10:20    3056238997


**CANADA LIFE**

U.S. Group
P.O. Box 105025
Atlanta, GA 30348-5025

September 3, 1999

(800) 554-4026
Long Term Disability & Life
Fax: (770) 618-4784
Short Term Disability
Fax: (770) 612-1564

Loma Beach-Allen
18800 NW 2nd Ave
Miami, FL  33169

RE:   **Short Term Disability 2nd Appeal**
      **Group: 86118**
      **Division: 0**
      **Certificate: 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**

Dear Ms. Beach-Allen:

The Canada Life Assurance Company has received and reviewed the 2nd appeal for the denial for continued short-term disabiltiy benefits beyond September 9, 1998.

**Please review the following policy definition:**

*"Disabled" and "disability" mean the person is not able to perform with reasonable continuity the substantial and material duties of his own occupation in the usual or customary way due to injury, disease, illness, pregnancy or mental disorder.*

Based on the review of the medical information that you provided to us, we find that we have more complete medical information in your file from Dr. Rosen's office that was received in our office September 8, 1998 via fax.  The office notes provided to us by Dr. Rosen indicate that on your visit to his office on September 3, 1998 you would be able to return to work on September 8, 1998, (please see the enclosed copy of the office note from Dr. Rosen). This information was also confirmed with Dr. Rosen's office by phone on September 8, 1998.

Although you did have some limitations at the time that Dr. Rosen released you to return back to work on September 8, 1998, you would not have met the definition of disability as above.  Also, there is not any new pertinent medical information that would support a continued disability beyond September 8, 1998.  Therefore, we have no choice but to uphold our decision to deny liability on your claim beyond September 8, 1998.  We regret that our decision could not be more favorable.

According to the Employee Retirement Income Security Act (ERISA) you have the right to appeal our decision to decline benefit payment.  Any appeal must be submitted in writing within 60 days of receipt of this letter.  Please forward any such appeal to my attention along with medical documentation that you feel supports disability.

Sincerely,

Tony Harper
Short Term Disability Manager
Group Claims

**P. EXHIBIT 27**

TH/smc

The Canada Life Assurance Company

HKZ  000212  017330  06040  0000066520  3

# Earnings Statement

**ADP®**

ECONOMIC OPPORTUNITY
FAMILY HEALTH CENTER
490 E. HIALEAH DRIVE
HIALEAH, FL. 33010

Period Ending:     04/02/1998
Pay Date:          04/10/1998

Social Security Number: 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
Taxable Marital Status: Single
Exemptions/Allowances:
  Federal: 2
  State:     No State Income Tax

JOYCE GREEN
597 NE 8TH STREET
MIAMI, FL 33136

| Earnings | rate | hours | this period | year to date |
|----------|------|-------|-------------|--------------|
| Regular | 7.0000 | 61.50 | 430.50 | |
| Gross Pay | | | $430.50 | 3,878.00 |

| Deductions | Statutory | | |
|------------|-----------|--|--|
| | Federal Income Tax | -18.14 | 221.47 |
| | Social Security Tax | -26.59 | 240.44 |
| | Medicare Tax | -6.24 | 56.23 |
| | Net Pay | $379.43 | |

Your federal taxable wages this period are $430.50

| Other Benefits and Information | this period | total to date |
|-------------------------------|-------------|---------------|
| Sick Bal. | | 32.00 |
| Vacation Bal. | | 24.64 |

**Important Notes**
HAVE A HAPPY EASTER

**Time Card Detail**

| DATE | | IN | OUT | IN | OUT | TOTAL |
|------|--|----|-----|----|-----|-------|
| Fri | 03/20 | 7:59am | 5:00pm | | | 8.00 |
| Sat | 03/21 | NO PUNCHES | | | | |
| Sun | 03/22 | NO PUNCHES | | | | |
| Mon | 03/23 | 8:00am | 5:00pm | | | 8.00 |
| Tue | 03/24 | 8:00am | 5:30pm | | | 8.00 |
| Wed | 03/25 | 8:03am | 5:30pm | | | 8.00 |
| Thu | 03/26 | 8:00am | 5:30pm | | | 8.00 |
| Fri | 03/27 | 8:00am | 5:00pm | | | 8.00 |
| Sat | 03/28 | NO PUNCHES | | | | |
| Sun | 03/29 | NO PUNCHES | | | | |
| Mon | 03/30 | 8:00am | 5:30pm | | | 8.00 |
| Tue | 03/31 | 8:00am | 2:30pm | | | 5.50 |
| Wed | 04/01 | NO PUNCHES | | | | |
| Thu | 04/02 | NO PUNCHES | | | | |

©1996 Automatic Data Processing, Inc.

# P. EXHIBIT 28

THIS BLUE AREA OF THE DOCUMENT CHANGES SHADE GRADUALLY AND EVENLY WITH DARKER AREAS ON TOP AND BOTTOM. THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK. HOLD AT AN ANGLE TO VIEW.

63-8376/2670

ECONOMIC OPPORTUNITY
FAMILY HEALTH CENTER
490 E. HIALEAH DRIVE
HIALEAH, FL. 33010

Payroll check number:  00066520
Pay date:              04/10/1998

Pay to the order of:   **JOYCE GREEN**

This amount:   THREE HUNDRED SEVENTY NINE AND 43/100 DOLLARS        $379.43

PAYROLL ACCOUNT

BANK ATLANTIC
MIAMI, FLORIDA

*Jessie True*
*Ellen Heidt*

⑈000066520⑈ ⑆267083763⑆ 0055163347⑈

ECONOMIC OPPORTUNITY
# FAMILY HEALTH CENTER, INC.
5361 N.W. 22nd Avenue * Miami, FL 33042 * Phone:(305)637-6400

## NARRATIVE

### June 1997   (M.A.P.I.)

## ACCOMPLISHMENTS:

The highlight of the month of June, was the HIV Prevention Training Workshop held in Orlando from June 11-13, 1997. This annual workshop was attended by staff members, Lorna Beach-Allen (Program Coordinator), Kenneth Duncan (Education Specialist) and Barbara Wilson (Peer Counselor).

Speakers at the workshop included Dr. James Howell (Secretary of the Department of Health), Mr. Thomas Liberti (Chief of HIV/AIDS Bureau, Office of Disease Intervention), and representatives from the Center for Disease Control and Prevention (CDC), and the Office of the Mayor of Orlando.

Former staff member, Vindrawatie Daharry (Peer Counselor) had resigned her position prior to this date, and then-current staff member, Manuel Reyes (Peer Counselor) graduated from high school on June 11. They both did not attend the mandatory workshop.

(Please note: As of July 1, 1997, Mr. Reyes will no longer be a member of the M.A.P.I. team. He has resigned, and will be joining the U.S. Marine Corp on August 11, 1997. We wish him the best of luck in his new career!!!)

During the month of June, ten (10) Education sessions were conducted, yielding a total of two hundred and sixty-eight (268) contacts. Nine (9) Outreach sessions yielded four hundred and ninety-nine (499) one-on-one, small group and/or individual contacts.

These accomplishments took place despite the resignation of one staff member; the illness of two staff members; the out-of-town trip of three staff members; and extenuating circumstances that took place during the month. These circumstances included bad weather, that forced the cancellation of some outreach sessions, and cancellations by collaborative agencies.

1

# P. EXHIBIT 29

NARRATIVE (continued)


Other accomplishments included  the recruitment and orientation (to the Agency and the M.A.P.I. Program) of four (4) new Volunteers  on June 23, 1997 from the WAGES Program (Department of Labor, Jobs and Benefits Division).  They are mandated to provide community service as part of the Workfare program.

Three of the Volunteers who started in May received AIDS 104 training at the Department of Health on June 25, 1997.  They shall receive their certificates before the end of July.  The other Volunteers in May received AIDS 101 training at the EOFHC Main Center on June 9, 1997.


## WORK IN PROGRESS:


The purchase of a new 19" television/v.c.r. combination set should facilitate some changes in the way we do our education presentations for the upcoming contractual (fiscal) year  -  July 1, 1997 through June 30, 1998.

We shall be presenting more HIV/STD/TB information (through the use of videos) to our clients, starting in July.  We shall also use this new equipment to train new Volunteers and other new Agency staff members during the upcoming months.

With the remaining budget for educational supplies, we were able to purchase additional condoms and a P.E.P. Talk Kit, which includes a dildo for condom use demonstrations.  We shall be implementing the use of this kit during our upcoming sessions.

During July, additional training in AIDS 101 and AIDS 104 will be scheduled for staff and volunteers.  AIDS 501 will be scheduled with the Department of Health.

Other work in progress includes the M.A.P.I. End -of- Contract report that will be submitted within the first twenty days of July.

Program Coordinator Lorna Beach-Allen will be attending the Program Evaluation course sponsored by the State of Florida Department of Health.  This course will take place from July 16-18, 1997 at the DIS Training Center in Lauderhill, Florida. The information derived from this course should be useful in improving the quality of the M.A.P.I. Program Education and Outreach Program.

NARRATIVE (continued)

PROBLEMS ENCOUNTERED:

The main problems encountered during the month of June were scheduling and training of staff and volunteers; inclement weather, including thunderstorms that caused cancellations of outreach sessions; and the loss of staff members, which placed an added burden on the remaining staff.

(Please note: We are still unable to get a commitment for TB training from the Department of Health for staff members and volunteers. Hopefully, July will bring us news of the availability of a TB course which we can attend).

Another problem encountered was that AIDS 104 training was not available to Agency staff and Volunteers whose names had been submitted since May for the June 25 class with the Department of Health. Two days before the class, we were told that there was not enough space for all of our people. Therefore, only three people were able to attend.

Lorna Beck - Allen
6/30/97

3



ECONOMIC OPPORTUNITY
FAMILY HEALTH CENTER
5361 N.W. 22nd Avenue
Miami, FL 33142
Tel: (305) 637-6400

FAMILY
HEALTH
CENTER,
INC.

February 10, 1999

Florida Department of Labor and Employment Security
Division of Unemployment Compensation
8300 NW 53rd Street, Suite 200
Miami, Florida 33166-7711

Re:   Claim for Unemployment Benefit for Lorna Beach-Allen
      SSN: 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

Dear Sir/Madam:

I am hereby requesting a hearing regarding the redetermination decision made for claimant, Ms. Lorna Beach-Allen.

A doctor's determination of her ability to perform the functions of a position offered to her was requested and was received. According to her doctor she is able to perform the functions of her job description.

Ms. Beach Allen is able to return to work. She has not been terminated.

Your response is anticipated.

Sincerely,

Carolyn Broughton
Director, Human Resources Management

# P. EXHIBIT 30





FLORIDA DEPARTMENT OF
CHILDREN

Accredited by: Accreditation Association for Ambulatory Health Care, Inc.

## LEAVE OF ABSENCE APPROVAL FORM

I understand that in accordance with the Family and Medical **Leave** Act of 1993 (FMLA), employees are provided leave, and I acknowledge that I have been provided with notice of my rights under the **FMLA**. I understand that I am to comply with the leave policy, including completion of this form. I also understand that leaves of absence are to be approved by the Vice President and are approved **for** periods that will exceed three working days. I understand performance reviews are postponed by the amount of leave.

Employee Name (print): LORNA BEACH-ALLEN   SS# 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

Site Location 5361 NW 22 AVE.(City/State) MIAMI FL

Current Position: PROGRAM COORDINATOR

If you have any accrued paid leave, that paid leave must be applied to this leave before any unpaid leave time.

I understand that a medical leave is the period of time my physician says I cannot work until the time the physician says I can return to work. All requests for personal medical and family leave due to the serious illness of a family member must include a physician's statement. For a leave based on my illness, a physician's release showing I am able to resume my normal job, or any restrictions, must be provided to my supervisor before I may return to work. Failure to provide the physician's statement may lead to the denial of a leave, denial of the continuation of leave, or denial of reinstatement. My medical leave will end if my physician releases me to restrictions, and the company agrees to accommodate my physician's instructions by temporarily modifying my job. If I do not accept the modified position, I must either apply for a personal leave or terminate my employment.

My leave will begin on: APRIL           7           1998
                         (month          day          year)

I will return to work on: UNDETERMINED AT PRESENT TIME /AS PER DR ROSEN
                          (month          day          / year)

I understand that upon my return to work on the date indicated, the company will reinstate me to my former position or an equivalent one, in accordance with applicable law and company policy. However, I have no greater right to reinstatement than if I had been continuously employed during the FMLA leave period. I understand that certain changes in hours or schedules may occur due to business necessity. If I fail to return to work on the return date (unless further approval is obtained), (or within the time limits described if the return date is blank), I will be considered as having voluntarily resigned effective on my last day of work.

# P. EXHIBIT 31

# MEMORANDUM

DATE:     April 7, 1998

TO:       Ms. Broughton,
          Director of Personnel

FROM:     Ms. C. Hafke,
          Director of Special Populations

SUBJ:     Transfer of Ms. Beach-Allen

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Approximately 2 weeks ago, I discussed with Ms. Beach-Allen my concerns regarding her interactions with Ms. Joyce Green, as I had seen Ms. Green in tears a few days prior after leaving the MAPI office. When I asked Ms. Green if she was all right, she initially did not want to speak with me, but came back later and stated she was very upset about several incidences that recently occurred between herself and Ms. Beach-Allen. These were mostly related to the death of Ms. Green's sister the first week of March and Ms. Beach-Allen's supposed insensitivity and harshness in the comments she made to Ms. Green. When I spoke to Ms. Beach-Allen about this, she denied making the comments and attributed Ms. Green's complaints to underlying jealousy because she was not offered the position of Education Specialist, recently vacated. I pointed out as managers our responsibility to handle employee situations in a sensitive manner and made several suggestions that were dismissed by Ms. Beach-Allen. Instead, she continued to focus on Ms. Green's motives for coming to me and made several references to her lack of education, past personal history and many faults. I stopped Ms. Beach-Allen from continuing and ended the conversation with a warning that it was her responsibility to resolve the issue with her staff and that it was unacceptable to allow this conflict to continue.

Unfortunately, Ms. Beach-Allen did not resolve the conflict, and within two weeks the situation had so escalated that two grievance letters against Ms. Beach-Allen were written by other staff, and the staff member in question submitted a letter of resignation.

The turmoil was such that the functioning of the entire program was in jeopardy. At this point it was necessary to intervene, and after seeking advise from yourself and the Chief Operating Officer, Dr. Brown, the decision was made to transfer Ms. Beach-Allen out of the MAPI program and into a vacant case manager's position.

I met with Ms. Beach-Allen today to inform her of my decision. With me was Mr. Julio Occtavianni, the manager of case management services. I discussed with Ms. Beach-Allen the reasons for the transfer, the grievance letters and her inability to manage the program effectively. Explained to her  the case management position and gave her the opportunity to ask Mr. Occtavianni any questions she might have. At this point, Ms.

# P. EXHIBIT 32



**ECONOMIC OPPORTUNITY**
**FAMILY HEALTH CENTER**
5361 N.W. 22nd Avenue
Miami, FL 33142
Tel: (305) 637-6400

June 1, 1998

**BOARD OF DIRECTORS:**

**OFFICERS:**

FATHER J. KENNETH MAJOR
*Chairperson*

GEORGE SIMPSON, M.D.
*Vice Chairperson*

BEATRICE LOUISSAINT
*Secretary*

PRISCILLA BEATTY, CPA
*Treasurer*

**BOARD MEMBERS:**

MARTHA ANDERSON
VASHTI C. ARMBRISTER
ELIZABETH BOZE
MARTHENIA DUPREE
DAVID EWING-CHOW, LMSSA
ORANGE HAYES
ELLEN HEIDT
REBECCA INGRAM-LEONARD, ESQ.
ALAN S. PAREIRA
DAVID F. PARISH, ESQ.
JOSEPH PATTERSON, PhD
RAMONA SLOWE
TAWANA THOMPSON
ROSA THORNTON, R.N.
SONNY WRIGHT

**HONORARY MEMBER:**

THE HONORABLE CARRIE MEEK

JESSIE TRICE, RN, MPH
*President/CEO*

Ms. Joyce Green
597 NE 8th Street
Miami, Florida  33136

Dear Ms. Green:

We have been informed by HRS Minority AIDS Prevention Initiative (MAPI) Program that effective June 30, 1998, our funding will terminate.  Therefore, it is with deep regret that we must terminate your employment with Economic Opportunity Family Health Center, Inc. effective June 30, 1998.

As per policy you will be paid for all unused vacation hours through June 30, 1998, up to 240 hours.

Your health insurance will terminate June 30, 1998.   You will be eligible to continue your health insurance coverage through COBRA (forms will be mailed to you within 14 days after termination date).

Thank you for your dedicated service.  Best wishes for the future.

Sincerely,

Carolyn Broughton
Director, Human Resource Management

CB:heh

# P. EXHIBIT 33

Accredited by Accreditation Association for Ambulatory Health Care, Inc.

CHILDREN & FAMILIES

001060



ECONOMIC OPPORTUNITY
FAMILY HEALTH CENTER
5361 N.W. 22nd Avenue
Miami, FL 33142
Tel: (305) 637-6400

February 9, 1999

Ms. Lorna Beach-Allen
18800 NW 2nd Avenue, #223
Miami, Florida 33169

Dear Ms. Beach-Allen

I have received the written statement from Dr. Rosen, and have been trying to reach you, with no success.

Please contact me as soon as possible (305) 341-7762.  Thank you.

Sincerely,

Carolyn Broughton
Director, Human Resources Management

P. EXHIBIT 34

**LOCK TOWNS COMMUNITY MENTAL HEALTH CENTER**    Date 3 / 3 / 99
**REFERENCE REQUEST**

Attention    Name    S.S. No.
MS. CAROLYN BROUGHTON    LORNA BENCH-ALLEN    133-54-422

Company Name
ECONOMIC OPPORTUNITY FAMILY HEALTH CENTER INC.

Street Address    Employment Dates
1790 E. HIALEAH DRIVE    From 12/96 to 1/99

City    State    Zip Code    Position Held    Salary
HIALEAH    FL    PROGRAM COORDINATOR    $ 26,250

Nature of applicant's work
CASE Manager

Are employment dates correct? If not, please supply correct date.
yes ☐ no ☐    from 12 / 96 / 98 to __/__/__    Employee Presents on leave.

Did applicant's position entail paper work?    yes ☐    no ☐    If yes, was it    Complete ☐    accurate ☐    neat ☐

Did applicant have custody of money ☐    merchandise ☐ valuables ☐    Were all properly accounted for? ☐ yes    If not please explain

How many personal injuries did applicant have while in your employ?    Was applicant absent
never or rarely ☐    occasionally ☐    repeatedly ☐

Did applicant collect worker's compensation while in your employ?    Yes ☐    no ☐    If yes, explain

Reason for Termination    laid off ☐    resignes ☐    discharged ☐    other ☑ Please explain Employee on leave.

Would you re-employ? yes ☐    no ☐ If not, please explain

|  | Excellent | Good | Fair | Poor |  | Excellent | Good | Fair | Poor |  | Excellent | Good | Fair | Poor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quality of Work |  |  | — |  | Ability |  |  |  |  | Health |  |  |  |  |
| Cooperation |  |  | — |  | Industriousness |  |  |  |  | Attitude Toward |  |  |  |  |
| Dependability |  |  | — |  | Honesty |  |  |  |  | Company |  |  |  |  |
| Safety Habits |  |  | — |  | Personal Habits |  |  |  |  | Appearance |  |  |  |  |
| Character |  |  |  |  |  |  |  |  |  |  |  |  |  |  |

REMARKS: Policy only allowes for Verification dates of employment and position titles.

Date 4 / 14 / 99 For Economic Opportunity Family    By Carolyn Brought Director
Health Ctr.    Name of Company    Signature & Title    HR

I have applied to Lock Towns for employment, and I desire that they be fully advised of my records with my former employers. I therefore, respectfully request that you furnish the necessary information concerning my employment with your organization, and I hereby release you from any and all liability of damages for providing the information requested.

Lorna Beach-Allen
SIGNATURE OF APPLICANT (To be signed in ink)

# P. EXHIBIT 35

We shall appreciate your replies to the above questions. All information will be held in strict confidence for our own use and benefit, without prejudice or liability on your part. A stamped, self addressed envelope is enclosed for your convenience.

LOCK TOWNS COMMUNITY MENTAL HEALTH CENTER
Personnel Department

07/30/2002  10:20   3056238997

| U. Equal Employment Opportunity Comm.   on |
|---|
| **DISMISSAL AND NOTICE OF RIGHTS** |

| To: | From:   Miami District Office |
|---|---|
| Lorna Beach-Allen | Equal Employment Opportunity Commission |
| 18800 N. W. 2nd Avenue, #219 D | One Biscayne Tower, Suite 2700 |
| Miami, Fl 33169 | 2 South Biscayne Boulevard |
| | Miami, Florida 33131-1805 |
| On behalf of a person aggrieved whose identity is | |
| CONFIDENTIAL (29 CFR § 1601.7(a)) | |

| Charge Number | EEOC Representative | Telephone No. |
|---|---|---|
| 150991467 | Susan A. Mann, Senior Investigator | (305)536-5383 or 536-4491 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ We cannot investigate your charge because it was not filed within the time limit required by law.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You had 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☒ The EEOC issues the following determination  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

---

**-- NOTICE OF SUIT RIGHTS --**
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may pursue this matter further by bringing suit in federal or state court against the respondent(s) named in the charge. **If you decide to sue, you must sue WITHIN 90 DAYS from your receipt of this Notice.** Otherwise your right to sue based on the above-numbered charge will be lost.

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible. (If you file suit, please send a copy of your court complaint to this office.)

On behalf of the Commission

**MAY 11 2000**

*(Date Mailed)*

Federico Costales, District Director

cc:
Economic Opportunity Family Health Center

c o Reginald J Clyne, Esquire

Simmons & Clyne, P. A.

Douglas Centre, Penthouse Two

4000 Douglas Road

Coral Gables, Florida 33134

**COPY**
**P. EXHIBIT 36**

FLORIDA DEPARTMENT OF LABOR AND EMPLOYMENT SECURITY
DIVISION OF UNEMPLOYMENT COMPENSATION     SOCIAL SECURITY NO: 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
8300 NW 53RD STREET  SUITE 200     CLAIM FILED EFFECTIVE: 08/02/98
MIAMI      FLORIDA     CLAIM OFFICE NO: 3677
        33166-7711     ISSUE CODE: 1 09 005000
             DATE MAILED: 02/04/99
        REDETERMINATION     ADJ NAME: 0 0 3038

## SECTION I. REASON FOR REDETERMINATION

THE CLAIMANT IS NO LONGER ON A LEAVE OF ABSENCE.

## SECTION II. REDETERMINATION

IN ACCORDANCE WITH SECTION 443, FLORIDA STATUTES:
BENEFITS ARE PAYABLE BECAUSE:
THE DETERMINATION DATED 09/08/98 FOR ISSUE CODE 09 HAS BEEN REMOVED.
THE CLAIMANT IS ELIGIBLE AS OF 01/10/99.

ANY BENEFITS RECEIVED FOR WHICH YOU WERE NOT ENTITLED ARE OVERPAYMENTS AND
SUBJECT TO RECOVERY.

## SECTION III. EMPLOYER CHARGEABILITY

## SECTION IV. APPEAL RIGHTS

THIS DETERMINATION WILL BECOME FINAL UNLESS YOU FILE A REQUEST FOR A HEARING
WITHIN TWENTY CALENDAR DAYS FROM THE MAILING DATE OF THIS NOTICE.  THIS REQUEST
MAY BE FILED IN PERSON OR BY LETTER TO THE OFFICE WHERE THE CLAIM WAS FILED
AND MUST EXPLAIN THE BASIS OF THE PROTEST.  THE POSTMARK SHALL BE CONSIDERED
THE DATE OF FILING BY MAIL.

IF UNEMPLOYED, YOU MUST CONTINUE REPORTING TO THE DIVISION UNTIL ALL
REDETERMINATIONS/APPEALS ARE RESOLVED.

CLAIMANT / AGENT ADDRESS         EMPLOYER / AGENT ADDRESS

LORNA    M BEACH ALLEN     ECONOMIC OPPORTUNITY FAMILY
18800 NW 2ND AVENUE APT 223     HEALTH CENTER INC
MIAMI        FL 33169     5361 NW 22ND AVE
               MIAMI        FL 33142-8035

# P. EXHIBIT 37

LES FORM UCB-48 (REV 09/98)